685 So.2d 163 (1996)
Paul E. HOLLENBECK,
v.
OCEANEERING INTERNATIONAL, INC. and Liverpool & London Steamship Protection and Indemnity Association, Ltd.
No. 96 CA 0377.
Court of Appeal of Louisiana, First Circuit.
November 8, 1996.
Rehearing Denied January 23, 1997.
*167 Charles B. Plattsmier, Baton Rouge, and Anthony M. Fazzio, Lafayette, for plaintiff/appellee, Paul Hollenbeck.
George D. Ernest, III, Preis, Kraft & Roy, Lafayette, for defendants/appellants, Oceaneering International and Liverpool & London Steamship Protection and Indemnity Association, Ltd.
Before WHIPPLE, PITCHER and FITZSIMMONS, JJ.
WHIPPLE, Judge.
This is an appeal by defendants, Oceaneering International, Inc. (Oceaneering) and Liverpool & London Steamship Protection and Indemnity Association, Ltd., from trial court judgments in favor of plaintiff, Paul E. Hollenbeck. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
In 1992, plaintiff began working for Oceaneering as a tender, a position which included duties of setting up equipment for the dive crew and generally assisting the dive crew aboard a vessel. On May 28, 1994, plaintiff was injured while working as a tender aboard the Ocean Diver III, a vessel owned and operated by Oceaneering. David Martin, the lead tender on this particular job, instructed plaintiff and another tender, Joseph Pouech, Jr., to transport some odem weights from the cargo deck, or main deck, up to the 0-1 level of the vessel. An "odem weight" is a square lead block weighing approximately fifty pounds, which is tied to a buoy. The buoy is then used to mark the location of an object below the water, such as a pipeline. Martin indicated to plaintiff and Pouech that the vessel was approaching the location of the pipeline which they needed to mark, and the odem weights were needed on the 0-1 level as soon as possible for deployment.
Because there were no mechanical lifting devices aboard, plaintiff and Pouech were required to manually transport the weights up the stairs to the 0-1 level. They first located the weights and carried them to the base of the stairs. After plaintiff and Pouech had positioned the weights at the base of the stairs, Martin returned and again urged them to get the weights to the 0-1 level as quickly as possible.
Pouech proceeded up the stairs, and as plaintiff started up the steps with a weight, Pouech reached down to grab the weight from plaintiff. Thereafter, plaintiff and Pouech continued to transport the weights in this fashion. Plaintiff would lift the odem weight by the PVC pipe handle attached to the weight by a chain. He would then walk up a couple of steps and hand the weight to Pouech, who had walked down a couple of steps. Pouech would grab a portion of the handle and the chain to receive the weight from plaintiff. As plaintiff handed a weight *168 to Pouech, he would ask Pouech if he had the weight, and Pouech would respond with words to the effect, "Yeah, I got it." Pouech would then walk up the remaining steps and place the weight on the 0-1 deck.
After successfully transferring some of the weights in this fashion, plaintiff attempted to hand an odem weight to Pouech and asked Pouech if he had the weight. Pouech responded that he had the weight, so plaintiff began to release his grip on the weight. However, Pouech had not in fact gained control of the weight, and as plaintiff attempted to release his grip, the weight began to fall. Plaintiff attempted to re-grip the weight and gain control of it. However, the weight fell across the front of plaintiff's body, and at the same time, plaintiff's foot slipped off the stairs, causing him to fall. Plaintiff felt a twisting and popping in his back, followed by a very sharp pain at his belt line. Plaintiff was subsequently diagnosed with a ruptured disc at L4-5 and a bulging disc at L5-S1.
On September 22, 1994, plaintiff filed suit in state court against Oceaneering under general maritime law and the Jones Act, 46 U.S.C. § 688.[1] Oceaneering's liability was predicated upon the alleged unseaworthiness of the vessel; failure to provide an adequate crew; failure to properly supervise the work performed; failure to properly train the crew; failure to provide proper equipment to perform the assigned tasks; failure of its employees to warn plaintiff of dangerous equipment; and failure of fellow employees to perform their tasks in a safe and reasonably efficient manner.
Following a bench trial, Oceaneering was found liable under general maritime law as the owner of the vessel and under the Jones Act as plaintiff's employer. In reasons for judgment, the trial court concluded that Oceaneering was liable to plaintiff under the Jones Act based on the negligence of coemployee Pouech, which it found to be the "predominant cause" of plaintiff's injuries. The trial court further concluded that the Ocean Diver III was unseaworthy, because the stairs were slippery and did not have a non-skid surface and that this condition of the stairs was also a cause of plaintiff's injuries. The court acknowledged the corresponding duty of a seaman to use reasonable care, but noted that this duty was slight. After considering all of the facts and circumstances, including the supervisor's admonition to hurry, the slippery and unseaworthy condition of the stairs and Pouech's negligence in stating that he had control of the weight when in fact he did not, the trial court assigned plaintiff 15% comparative fault based on plaintiff's decision to transfer the weights in the manner described above.
The court assessed plaintiff's damages as follows:

Past medical expenses $ 2,369.15
Future medical expenses 47,000.00
Past pain and suffering, mental
anguish and mental pain and suffering 125,000.00
Future pain and suffering,
mental anguish and future mental
pain and suffering 125,000.00
Permanent physical impairment
and loss of enjoyment of life,
including loss of ability to work
at chosen profession 100,000.00
Past loss of wages 32,100.00
Future loss of wages and loss of
earning capacity 489,223.00
 ___________
 TOTAL: $920,692.15

Judgment was rendered on November 9, 1995, awarding plaintiff the above sums, reduced by his 15% comparative fault, together with legal interest. The judgment further ordered the parties to submit calculations on the issue of loss of found to the court within ten days. Subsequently, on November 27, 1995, the trial court rendered a supplemental judgment, awarding plaintiff $43,200.00 for loss of found and assessing expert witness fees to be taxed as costs against defendants.
From these judgments, defendants appeal, assigning the following as error:
(1) The trial court failed to apply the correct cause-in-fact standard in determining Oceaneering's liability;

*169 (2) The trial court erred in not assessing a greater percentage of fault to plaintiff;
(3) The trial court applied the improper legal standard by placing the burden of proof on Oceaneering to show it was not negligent;
(4) The trial court erred in applying an improper standard in finding the Ocean Diver III unseaworthy;
(5) The trial court's general damage award of $350,000.00 is excessive;
(6) The trial court erred in awarding damages for future lost wages when it concluded that plaintiff would continue to earn diver's wages when plaintiff "left the water";
(7) Even if the trial court's findings are correct, the trial court erred in calculating the amount of lost future wages;
(8) The trial court erred in awarding damages for "found" because plaintiff did not plead "found" as an element of damages;
(9) The trial court erred in using impeachment evidence to support an award of "found";
(10) The trial court erred in awarding damages for "found" because there was no evidence introduced at trial to support an award of "found";
(11) The trial court erred in not discounting damages for "found" to present value;
(12) The trial court erred in awarding damages for future medical expenses because there was no evidence to support an award of $47,000.00 for future medicals; and
(13) The trial court erred by not discounting future medical expenses to present value.

JONES ACT NEGLIGENCE

(Assignment of Error No. 1)
In their first assignment of error, defendants aver that the trial court erred in finding that Oceaneering's conduct was the cause-in-fact of plaintiff's accident. Rather, they argue that the trial court should have concluded that but for plaintiff's decision to transfer the odem weight in the manner he employed, the accident would not have occurred. Thus, they aver that plaintiff's conduct was the only cause of his accident. We disagree.
Under the Jones Act, a defendant must bear the responsibility for any negligence, however slight, that played a part in producing the plaintiff's injury. In re Cooper/T. Smith, 929 F.2d 1073, 1076-1077 (5th Cir.), cert. denied sub nom., Abshire v. Gnots-Reserve, Inc., 502 U.S. 865, 112 S.Ct. 190, 116 L.Ed.2d 151 (1991). Because an employer is liable for the negligence of his employees under the Jones Act, the Jones Act generally provides a broad basis for liability. In addition, the Jones Act contains a liberal causation requirement. If the defendant's negligence played any part, however small, it results in liability. Brister v. A.W.I., Inc., 946 F.2d 350, 354 (5th Cir.1991). Evidence of the "slightest" negligence is sufficient to sustain a finding of Jones Act liability, and the burden on a plaintiff for showing causation in a Jones Act claim is "featherweight." Johnson v. Offshore Express, Inc., 845 F.2d 1347, 1352 (5th Cir.), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988). Moreover, a trial court's factual findings in general maritime and Jones Act cases are reviewed under this state's manifest error standard of review. Milstead v. Diamond M Offshore, Inc., 95-2446, p. 11 (La.7/2/96); 676 So.2d 89, 96.
The record reveals that in an effort to transfer the weights to the 0-1 level as quickly as possible as per their employer's instructions, plaintiff and Pouech chose a method of handing off the weights one to the other while standing on the stairwell. Plaintiff would hand a weight to Pouech and inquire as to whether Pouech had control of the weight. Pouech would then respond, "I got it." However, on the transfer in question, Pouech told plaintiff he had control of the weight when in fact he did not. Relying on Pouech's statement that he had the weight, plaintiff attempted to release his grip on the weight, at which point the weight fell back on plaintiff. Based on this evidence, we find no manifest error in the trial court's determination that Pouech's negligence in stating that he had control of the weight when he actually did not was a cause of *170 plaintiff's injury. This assignment of error lacks merit.

UNSEAWORTHINESS

(Assignments of Error Nos. 1, 3 and 4)
Defendants also averred in assignment of error number one that the trial court erred in concluding that the alleged unseaworthiness of the vessel was the cause-in-fact of plaintiff's accident, arguing that but for plaintiff's own conduct, the accident would not have happened. Additionally, in their third assignment of error, defendants argue that the trial court applied the incorrect legal standard by requiring Oceaneering to prove that the vessel was in fact seaworthy, rather than requiring plaintiff to prove its unseaworthiness. Finally, in their fourth assignment of error, defendants aver that the trial court erroneously placed a higher standard on a shipowner than is required under general maritime law in finding the Ocean Diver III unseaworthy.
A vessel is unseaworthy if it and its appurtenances are not reasonably fit for their intended use. Johnson, 845 F.2d at 1354. The owner's duty to furnish a seaworthy ship is absolute and nondelegable and completely independent of the duty under the Jones Act to exercise reasonable care. Liability under the doctrine of unseaworthiness does not rest upon fault or negligence. Brister, 946 F.2d at 355; Johnson, 845 F.2d at 1354.
There is a more demanding standard of causation in an unseaworthiness claim than in a Jones Act negligence claim. To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness. Brister, 946 F.2d at 355; Johnson, 845 F.2d at 1354.
As plaintiff attempted to regain control of the falling odem weight, his foot slipped off the step, causing him to fall. The trial court specifically found that the stairs in question were unseaworthy due to their slippery condition and the lack of a non-skid surface and that plaintiff's foot slipping off the step was a cause of the accident. These findings that the stairs were not reasonably fit for their intended use and that the condition of the stairs was a contributing cause to plaintiff's injury are factual determinations of the trial court which will not be disturbed in the absence of manifest error. See Milstead, 95-2446 at p. 11; 676 So.2d at 96.
The stairs in question were constructed of steel with an elevated tread pattern designed to provide traction. Regarding the condition of the stairs at the time of plaintiff's accident, Pouech testified that the stair treads were wet, the elevated treads had worn down with use and there was no non-skid material on the steps. Pouech testified that when he first walked up the stairs directly before he and plaintiff began transporting the weights up the stairs, he slipped on the stairs due to their wet, slippery condition. Pouech was shown a photograph of the stairs taken approximately one year after the accident, which depicts black, non-skid strips placed on each of the steps. However, Pouech unequivocally testified that on the day of plaintiff's accident, there were no black, non-skid strips on the steps. Similarly, plaintiff testified that at the time of his accident, the stairs were damp and the non-skid paint had been worn off of the treads. Plaintiff also testified that there were no black, non-skid strips on the steps at the time of his accident.
Andrew Weysham, the dive supervisor on this particular job, was questioned about the condition of the stairs at the time of plaintiff's accident. Weysham testified that he recalled that the "general condition" of the stairs was good and that the steps had been painted with a non-skid substance. However, Weysham admitted that he did not have any specific recollection as to whether there were non-skid strips affixed to the steps at the time of plaintiff's accident.
After considering the evidence presented by plaintiff as to the condition of the stairs, the trial court further noted that Oceaneering had failed to present any evidence which would rebut plaintiff's evidence. Defendants argue that these comments indicate *171 the trial court improperly placed the burden on Oceaneering to prove the seaworthiness of the vessel. We disagree. It is clear from the trial court's reasons that the trial court carefully weighed the evidence presented and determined that plaintiff had carried his burden of proof on this issue. The trial court obviously credited the testimony of Pouech and plaintiff over that of Weysham as to the condition of the steps and the absence or deterioration of non-skid paint on them at the time of the accident. We cannot conclude that the trial court's comments on defendants' failure to present rebuttal evidence on this point resulted in an erroneous shifting of the primary burden from plaintiff to defendants.
Moreover, considering the evidence presented by plaintiff as to the condition of the stairs at the time of his accident, we cannot conclude that the trial court held Oceaneering to a higher standard than is required of the vessel owner under general maritime law. Given the wet, slippery condition of the steps, the fact that the non-skid paint was worn off and the absence of nonskid strips on the steps, we find no manifest error in the trial court's conclusions that the steps were not fit for their reasonably anticipated use and that the defective condition of the stairs played a substantial part in plaintiff's accident.

PLAINTIFF'S COMPARATIVE FAULT

(Assignment of Error No. 2)
In their second assignment of error, defendants argue that the trial court erred in not assessing a greater percentage of fault to plaintiff.[2] The trial court's allocation of percentages of fault is a finding of fact. Johnson, 845 F.2d at 1355. Under the Jones Act and the law of seaworthiness, contributory negligence, however gross, does not bar recovery, but only mitigates damages. Although the seaman has a duty to use reasonable care, the seaman's duty to protect himself is slight since this duty is tempered by the realities of maritime employment. Johnson, 845 F.2d at 1355. Generally, a seaman has no duty to find the safest way to perform his work; rather, the duty to provide for a safe course of conduct lies primarily with the vessel owner. Johnson, 845 F.2d at 1355.
In the instant case, plaintiff and Pouech were exhorted by Martin to perform the task of transporting the odem weights to the 0-1 level as quickly as possible. Although Martin denied ordering them to hurry, both plaintiff and Pouech testified that Martin was agitated and that he used profanities when ordering them to quickly perform this task. Moreover, while Martin admitted that he returned on one occasion to check on plaintiff and Pouech's performance of the task, both plaintiff and Pouech testified that Martin returned on two occasions, yelling at them to hurry along. Based on this evidence, the trial court found that the evidence demonstrated that plaintiff and Pouech perceived that they had to hurry up with this task. The trial court additionally noted that although in hindsight the method of transfer chosen may not have been the safest method, it was the method chosen by these seaman due to the admonition of their supervisor to hurry. Furthermore, the trial court concluded that the predominant cause of plaintiff's accident was Pouech's negligence in announcing that he had control of the weight when he clearly did not, and thus, Oceaneering is liable for the negligence of its employee.
Considering the foregoing, we find no error in the trial court's finding that plaintiff was only 15% at fault in causing the accident. This assignment of error also lacks merit.

DAMAGES

General Damages

(Assignment of Error No. 5)
Defendants next argue that the trial court's general damage award is excessive. *172 The trial court awarded the following sums in general damages: Past pain and suffering, mental anguish and mental pain and suffering$125,000.00; future pain and suffering, mental anguish and future mental pain and suffering$125,000.00; and permanent physical impairment and loss of enjoyment of life, including loss of ability to work at chosen profession$100,000.00. Thus, the general damage award totaled $350,000.00.
The trier of fact is accorded much discretion in fixing general damage awards. LSA-C.C. art. 2324.1; Cheramie v. Horst, 93-1168, p. 6 (La.App. 1st Cir. 5/20/94); 637 So.2d 720, 723. The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Youn, 623 So.2d at 1260.
The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Youn, 623 So.2d at 1260. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 So.2d at 1261.
Plaintiff was only twenty-six years old at the time of this accident, and had never had any back injuries or health problems prior to this accident. Immediately after the accident, plaintiff felt a very sharp pain in his lower back, and after only a few minutes, his back began to stiffen. Although he was in pain, plaintiff did not request to be brought to shore, because he knew that if he did, everyone on the job would lose their safety bonus. Thus, plaintiff continued to work offshore, performing light duty, for the remainder of the job, which was completed on June 7, 1994.
Two days after returning to shore, plaintiff obtained permission from Oceaneering to see a doctor. Oceaneering referred him to a Dr. Askew, a general practitioner, who prescribed pain medication and bed rest. When his pain continued, plaintiff returned to the same medical office and was seen by Dr. Walter Daniels. Dr. Daniels recommended an MRI of the lumbar spine, which was performed on June 20, 1994, at Lakewood Hospital in Morgan City. The MRI revealed a herniated disc at L4-5 and considerable desiccation, or loss of hydration, of the L5-S1 disc; thus, Dr. Daniels referred plaintiff to Dr. H. Carson McKowen, a neurologist.
Dr. McKowen initially recommended physical therapy. However, after two or three weeks of physical therapy, plaintiff's complaints of back pain had worsened. At that point, Dr. McKowen recommended a myelogram. On August 17, 1994, plaintiff underwent a lumbar myelogram and postmyelographic CT scan of the lumbar spine at Thibodaux General Hospital. These tests indicated a ruptured disc at L4-5 and a bulging disc at L5-S1, and Dr. McKowen recommended immediate surgery.
Because plaintiff wanted to obtain a second opinion before undergoing surgery, he went to Dr. Lawrence Russo at the recommendation of a friend. Dr. Russo, a board certified orthopedic surgeon, first examined plaintiff on August 23, 1994. Plaintiff complained of pain in his low back, radiating down his left leg to the knee. The results of the MRI, myelogram and a CT scan confirmed that plaintiff had a ruptured disc at L4-5 and a protruding disc at L5-S1.
Plaintiff returned to Dr. Russo on September 8, 1994, at which time Dr. Russo noted that nerve root impingement was present. On that day, Dr. Russo recommended surgery to remove the L4-5 disc. That same month, Dr. Russo performed a laminectomy and diskectomy at L4-5. Dr. Russo noted that plaintiff had a significant amount of scarring in the area, probably caused by *173 bleeding in the area. Meticulous dissection was required to remove the scar tissue, and during that procedure, a small rent was made in the dura, which is the covering of the nerves. The dura was repaired, and plaintiff remained hospitalized for four to five days. Because of the tear in the dura, plaintiff was kept lying on his back while hospitalized and was instructed to remain at rest for two to three weeks following his release from the hospital.
Plaintiff testified that for a period of weeks following his surgery, he was unable to sleep through the night due to pain. While the surgery had relieved the pain in his left leg, he continued to have significant lower back pain. Dr. Russo noted that the persistence of back pain following removal of a disc is fairly common, and he continued to prescribe pain medication to plaintiff in an effort to manage his pain.
In the year following his surgery, plaintiff continued to suffer with back pain and flareups of intensified lower back pain and radicular pain. As of the time of trial, Dr. Russo opined that plaintiff had reached maximum medical benefit, and he assigned plaintiff a 25% permanent physical impairment rating to his body as a whole. With regard to physical restrictions, he stated that plaintiff is permanently restricted from lifting in excess of 25 to 30 pounds; repetitive bending, stooping and crawling; and any other position which will cause him back pain. Dr. Russo additionally noted that plaintiff will experience difficulty with driving for long distances. Dr. Russo opined that plaintiff could return to work as of the time of trial provided he works in a sedentary position.
With regard to long term pain, Dr. Russo testified that plaintiff can expect to experience low back pain on a permanent basis and that plaintiff will have to learn to live with this pain. Dr. Russo explained that even if plaintiff stays within the physical restrictions outlined, plaintiff will continue to require medication for pain, including over-the-counter medication as well as prescription pain relievers from time to time. Additionally, Dr. Russo explained that removal of a disc has the effect of wearing out the discs above and below at a faster rate. Moreover, considering plaintiff's young age and the weakened condition of the L5-S1 disc, Dr. Russo opined that herniation of the L5-S1 disc can occur more easily and that there is a 25 to 30% chance that the disc will rupture in the future.
As a result of his back pain, recommended physical restrictions and the need to protect against further injury to the L5-S1 disc, plaintiff's lifestyle has changed drastically. Plaintiff testified that he loved the water and had chosen to make diving his career. However, because of his injury, he can never return to this profession. Additionally, prior to the accident, plaintiff led a very active life, enjoying such strenuous physical activities as hiking, camping, water skiing, mountain biking and rock climbing. Because he is now limited to a sedentary lifestyle, he is no longer able to engage in any of these activities.
Considering plaintiff's young age, the pain he will continue to endure for the rest of his life, and the vast change in lifestyle forced upon plaintiff by his injuries, we cannot conclude that the trial court abused its vast discretion in awarding plaintiff $350,000.00 in general damages.

Loss of Future Earning Capacity

(Assignments of Error Nos. 6 and 7)
Defendants argue that the trial court erred in concluding that plaintiff would have continued to earn diver's wages after leaving employment as a diver, commonly referred to as "exiting the water," when there was no factual or expert testimony of record to support that conclusion. Alternatively, they aver that even if the trial court's findings as to plaintiff's earning capacity after exiting the water are correct, the trial court committed a mathematical error in calculating the amount of lost future wages.
It is well established that an award for loss of future earning capacity is not merely predicated upon the difference between a plaintiff's earnings before and after a disabling injury. Rather, the award is predicated upon the difference between a plaintiff's earning capacity before and after a disabling injury. Martino v. *174 Sunrall, 619 So.2d 87, 90 (La.App. 1st Cir.), writ denied, 621 So.2d 821 (La.1993).
The record shows that upon graduation from diving school, an individual is generally hired as a tender, a position which has two levelstender 2 and tender 1. After working as a tender for some period of time, a tender may be promoted to the position of diver tender. After gaining additional experience as a diver tender, an individual may be promoted to diver, class 3. The remaining levels of promotion include diver, class 2; diver, class 1; and dive supervisor. Dr. John Grimes, plaintiff's vocational rehabilitation expert, testified that divers generally "exit the water," or complete their diving careers, between the ages of forty and forty-five.
In the instant case, plaintiff graduated from diving school with additional training and certification in underwater welding. While he was still in diving school, Oceaneering offered plaintiff a job, and he was initially hired as a tender 2. After several months in this position, he was promoted to a tender 1. At the time of the accident, plaintiff was attempting to schedule the written examination that he was required to pass to be promoted to the position of diver tender.
Regarding plaintiff's ability to return to his previous profession, the trial court determined that because of his injuries, plaintiff can never return to the profession of diving. The trial court further determined that in the absence of his injury, plaintiff's earning capacity as a diver tender would have been $30,000.00 to $35,000.00 per year and that as a diver, particularly considering plaintiff's abilities as a certified welder, his earning capacity would be no less than $45,000.00 per year. Defendants do not challenge these factual findings of the trial court.
However, the trial court further found that the skills one learns as a diver could be easily transferred to such positions as foreman, job supervisor and even sales positions in the oil industry. Thus, the court found as a fact that even upon exiting the water, plaintiff could have earned a salary of $45,000.00 per year in the oil industry in general. Defendants aver that there is no evidence of record to support this finding.
As stated above, the record clearly reflects that a diver may be promoted to the position of dive supervisor. The duties of a dive supervisor include those of a job foreman, overseeing the job, organizing equipment and personnel, and formulating and implementing a job procedure. The evidence further suggests that a dive supervisor is capable of earning wages of more than $50,000.00 to $60,000.00 per year.
The fact that the vocational rehabilitation experts may have stated that it was speculative whether plaintiff would actually have become a dive supervisor is irrelevant. Once plaintiff demonstrated he had the capacity to become a supervisor prior to the accident, the trial court reasonably concluded that plaintiff had suffered a loss of the earning capacity, regardless of whether or not he would have actually chosen to accept such a position in the future.
All of the evidence presented indicated that plaintiff was a good worker, was motivated in his career, and could have progressed from a tender to dive tender to a diver. Additionally, plaintiff has an I.Q. of 111, in the upper one-third of the population, indicating no barriers intellectually to plaintiff rising to the position of dive supervisor. Glenn Hebert, plaintiff's vocational rehabilitation specialist, testified that although it may be speculative as to whether plaintiff would have actually become a dive supervisor, plaintiff had the intellectual ability to perform this job, and there was nothing in his health or background to contraindicate plaintiff's rising to this position. Thus, we conclude that there was sufficient evidence presented to establish that plaintiff had the capacity to rise in his profession to the supervisory position of dive supervisor after he exited the water as a diver. We find no error in the trial court's factual finding that prior to this accident, plaintiff had the capacity to earn $45,000.00 per year even after exiting the water. This assignment of error has no merit.
Defendants next argue that the trial court committed a mathematical error in calculating plaintiff's loss of future earning capacity. The trial court concluded that in the absence of injury, plaintiff could have earned $45,000.00 *175 per year, after breaking out as a diver and continuing through his remaining work life expectancy. The trial court further concluded that plaintiff's post-accident earning capacity would be $22,500.00 to $24,000.00 per year after two years of additional schooling or training. Based on these factual findings, the trial court concluded that plaintiff had suffered a loss of future earning capacity of $489,233.00. Defendants aver that the award of $489,223.00 should be reduced by $29,699.00 to $459,524.00 to correct an alleged error in calculation.[3]
Awards for loss of earning capacity are speculative by nature and cannot be calculated with mathematical certainty. Therefore, the trier of fact necessarily must have much discretion in fixing these awards. Martino, 619 So.2d at 90. Initially, we note that there is nothing in the record to indicate that the method of calculation used by defendants in brief to this court represents the method utilized by the trial court in computing its award.[4] Moreover, in reviewing the overall award of $489,223.00 for loss of future earning capacity, we cannot conclude that the trial court abused its discretion in setting this award. This assignment of error also lacks merit.

Loss of Found

(Assignments of Error Nos. 8, 9, 10 and 11)
With regard to the trial court's award for loss of found, defendants aver that the trial court erred: (1) in awarding damages for loss of found where plaintiff did not plead "found" as an element of damages; (2) in using impeachment evidence to support the award of found; (3) in awarding damages for loss of found where there was no evidence introduced at trial to support the award; and (4) in not discounting damages for loss of found to present value.
"Found" is an element of damages representing the value of living expenses provided to a seaman by his employer as a condition of employment while aboard ship. Found generally includes expenses for food, lodging and clothing. Youn, 623 So.2d at 1261.
Defendants first argue that found is an item of special damages, which must be specifically pleaded, and because plaintiff did not plead his entitlement to found, the trial court erred in awarding this element of damages.
When special damages are claimed, they must be specifically alleged. LSA-C.C.P. art. 861. Special damages are those which can be fixed to pecuniary certitude. Stevens v. Winn-Dixie of Louisiana, 95-0435, p. 9 (La.App. 1st Cir. 11/9/95); 664 So.2d 1207, 1213.
Without determining whether "found" is truly an item of special damages, we note, as did the trial court, that in his petition, plaintiff specifically prayed for damages for "loss of employee benefits, past and future." Clearly, found represents a benefit provided to a seaman by his employer as a condition of his employment aboard a vessel. See Youn, 623 So.2d at 1261. Thus, we find no error in the trial court's conclusion that plaintiff had adequately pleaded his entitlement to such an award. See Stevens, 95-0435, at p. 9; 664 So.2d at 1213.
Defendants argue further that the trial court erred in rendering this award where there was no evidence introduced at trial to support the award. Specifically, defendants contend that although there is evidence that plaintiff ate and slept aboard the vessel when offshore, there is absolutely no evidence in the record to support a finding *176 that Oceaneering furnished these benefits to plaintiff. We disagree.
Terrence Overland, Oceaneering's Americas Region safety officer, testified that the Ocean Diver III was owned by Oceaneering and that the vessel had sleep quarters and a galley on board. Overland further testified that Oceaneering's dive crews eat and sleep aboard the vessel when assigned to work offshore on one of its vessels.
Moreover, plaintiff testified that the majority of his work offshore was performed aboard the Ocean Diver III and the Mister Cliff, another vessel owned by Oceaneering. In accord with Overland's testimony, plaintiff also testified that when he worked offshore, he slept aboard the vessel and was provided with meals. Considering this evidence, we find no manifest error in the trial court's factual conclusion that food and lodging were provided to plaintiff by Oceaneering as a benefit of his employment while working offshore.
Defendants next contend that the trial court erred in relying upon impeachment evidence in setting the value of found. In oral reasons for judgment, the trial court stated as follows:
So the Court will allow both parties to submit post-trial memo within ten days to assist the Court in adequateI mean, in accurately computing the loss of found award. Andhowever, I will not reopen the evidence to allow introduction of any additional testimony on the matter. I simply want some mathematical calculations by both sides. I would feel that the fairest way to do itand direct that the parties do thisgive me their thoughts alternatively, but I would direct that they take the '93 time that this man spent offshore, shown by his wage records from exhibits, and calculate the found at $10.00 a day, which is the sum used in the [Youn] court, there being no other evidence in the record except the Court's common sense to base the award on. I would think the award should be much higher than that. I would think that the actual cost of providing food, clothing, and lodging to an injuredto a seaman while he's working offshore would be in the $30.00 a day range, as opposed to the $10.00 a day range. But since there was no evidence presented in the record to that effect, unless counsel for plaintiff or defendant can point the Court to some, [the Court] will restrict the award to the $10.00 a day.
Subsequently, on November 27, 1995, the trial court issued written reasons for judgment on the issue of found. In its reasons, the trial court stated that it was awarding found in the amount of $20.00 per day, based on Defendant's Exhibit 5, a statement by plaintiff taken by Oceaneering's investigator, Mr. Joe Sarkies prior to the filing of suit. In the statement, Mr. Sarkies corrected a comment by plaintiff, and noted that plaintiff was receiving $20.00 per day in maintenance. Finding that both "found" and "maintenance" measure the value of food and lodging provided to the seaman, the court rendered an award of $20.00 per day for found.
Defendants argue that Defendant's Exhibit 5 was introduced into evidence solely for impeachment purposes to show plaintiff's prior inconsistent statement as to the reasons for his discharge from the armed forces. Relying on LSA-C.E. art. 607(D)(2), defendants argue that Defendant's Exhibit 5 constitutes impeachment evidence and could not be relied upon by the trial court as substantive evidence. Louisiana Code of Evidence article 607(D)(2) provides as follows:
D. Attacking credibility extrinsically. Except as otherwise provided by legislation:

* * * * * *
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
Initially, we note that although a prior inconsistent statement of a witness may only be used for impeachment purposes, Marshall v. Duncan, 542 So.2d 691, 695 (La. App. 4th Cir.), writ denied, 544 So.2d 410 *177 (La.1989), this rule does not apply to a prior inconsistent statement of a party. A party's prior inconsistent statements may be admissible for both impeachment and substantive purposes. LSA-C.E. art. 801(D)(2); Stapleton v. Great Lakes Chemical Corporation, 616 So.2d 1311, 1325 (La.App. 2nd Cir.), vacated in part on other grounds, 627 So.2d 1358 (La.1993); Pugh, Force, Rault, and Triche, Handbook on Louisiana Evidence Law (1996).
The portion of the statement in Defendant's Exhibit 5 cited by the trial court in its additional reasons for judgment was not the prior inconsistent statement of plaintiff. Rather, it was a statement made by the interviewer, Mr. Sarkies, in the course of his interview of plaintiff correcting plaintiff's comment therein that he was receiving $15.00 per day in maintenance. Clearly, the comment by Mr. Sarkies constituted inadmissible hearsay. LSA-C.E. arts. 801, 802, 803, and 804. However, it is noteworthy that defendants introduced the statement, including the comments by Mr. Sarkies and the response thereto by plaintiff, in its entirety and without limitation.
LSA-C.E. art. 105 provides that when evidence is admissible for one purpose but not admissible for another purpose, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. The article further provides that failure to restrict the evidence and instruct the jury shall not constitute error absent a request to do so. When the statement was admitted into evidence, no request was made by either party to restrict the evidence to its proper scope. Indeed, both plaintiff's and defendants' counsel questioned plaintiff about portions of the statement. In the absence of a request by either party to limit the use of the statement, we find no error in the trial court's award. See Turcich v. Baker, 594 So.2d 505, 508 (La.App. 5th Cir.1992). Moreover, considering the record in its entirety, we find that the award of $20.00 per day was within the trial court's discretion. See Youn, 623 So.2d at 1262.
Finally, defendants argue that the trial court erred in failing to discount the award of found to present value. Damage awards for future pecuniary losses in suits governed by federal law must be discounted to present value. Monessen Southwestern Railway Company v. Morgan, 486 U.S. 330, 339, 108 S.Ct. 1837, 1844, 100 L.Ed.2d 349 (1988); Culver v. Slater Boat Co., 722 F.2d 114, 122 (5th Cir.1983), cert. denied sub nom., Reederei v. Byrd, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984) and St. Paul Fire & Marine Insurance Company v. Culver, 469 U.S. 819, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984); see also Texas and Pacific Railway Company v. Buckles, 232 F.2d 257, 264 (5th Cir.), cert. denied, 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498 (1956).
In its reasons for judgment, the trial court stated that it would award plaintiff damages for loss of found through age forty-five, which the court found was the age at which plaintiff would end his career as a diver, based on the number of days plaintiff worked offshore in 1993. The court further noted that although it was expected that plaintiff would spend some time offshore after age forty-five, an award of found past the age of forty-five would be "difficult to calculate." With regard to discounting the award to present value, the court stated as follows:
The Court is not discounting this amount to present day value because the Court is taking into consideration the fact that the likelihood is plaintiff would have worked more than 120 days a year as a diver offshore and the likelihood is that he would have worked past age 45 to some extent as a diver supervisor.
The award for loss of found, like most awards for future damages, is obviously speculative by nature, and it is for this reason that the trial court is accorded discretion in setting the award. See Youn, 623 So.2d at 1261-1262. We recognize that federal law still requires that future damage awards be discounted to present value. See Monessen Southwestern Railway Company, 486 U.S. at 339, 108 S.Ct. at 1844. While the trial court's comments set forth that he was not discounting the amount to present day value, it is clear from the remainder of the court's comments that the trial court applied a discount factor by limiting the years for which *178 found would be awarded, despite the court's belief that plaintiff would more probably than not have continued to work offshore past age 45. From our review of the record, we find no error by the trial court in this determination.

Future Medical Expenses

(Assignments of Error Nos. 12 and 13)
In these two assignments of error, defendants argue that the trial court abused its discretion in awarding excessive damages for future medical expenses and also erred in failing to discount the future medical expenses award to present value. Future medical expenses must be established with some degree of certainty. However, an award for future medical expenses is by nature somewhat speculative. Martino, 619 So.2d at 91. When the record establishes that future medical expenses will be necessary, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. Youn, 623 So.2d at 1262.
In the instant case, the trial court awarded plaintiff $47,000.00 in future medical expenses. The record reflects that plaintiff will continue to require medical treatment at approximately two month intervals and will require x-rays twice a year. A normal office visit without x-rays costs plaintiff $117.00. Moreover, plaintiff will need pain medication on a permanent basis in the future. In setting the award for future medical expenses, the trial court noted that in the year preceding trial, plaintiff had incurred $2,700.00 in medical expenses.[5] Citing Dr. Rice's testimony in part, the court concluded that a reasonable award would be $1,000.00 per year for the remaining forty-seven years of plaintiff's life expectancy. It is clear from the record that the trial court carefully weighed these factors, and was aware of the discount factors suggested by the parties respective experts, albeit on the issue of earning capacity. While the reasons do not clearly indicate what factor, if any, was used by the court, we find the record supports the award made by the trial court. Considering the foregoing, we find no abuse of discretion in the trial court's award of $47,000.00 for future medical expenses.

CONCLUSION
For the above and foregoing reasons, the November 9, 1995 judgment is affirmed in its entirety. The November 27, 1995 supplemental judgment is also affirmed in its entirety. Costs of this appeal are assessed against defendants.
AFFIRMED.
FITZSIMMONS, J., concurs in part, dissents in part and assigns reasons.
FITZSIMMONS, Judge, dissenting.
The standard to determine loss of future income is set forth in Folse v. Fakouri, wherein the court stated:
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.

Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979)
We have previously observed:
Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiff's past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to *179 earn wages over the remainder of his working life. Haydel v. Hercules Transport, Inc., 654 So.2d 418, 435 (La.App. 1st Cir.1995).
This standard, then, is more than pure speculation that one will climb the ladder of success in any given trade, profession or occupation.
Mr. Hollenbeck's actual salary at the time of the injury was $21,000 per year as a starting tender. The court considered expert testimony by both parties to reach the conclusion that Mr. Hollenbeck's earning capacity at the time of his injury was actually $30,000 to $35,000 per year. Although Hollenbeck had not taken the written examination to qualify as a diver tender, the judge found that he had "anticipated" doing so in the near future. The court further adduced that a diver tender with the welding capability that the injured party possessed could earn approximately $45,000 per year. This determination was based upon expert testimony on behalf of the appellee. Diver tenders statistically "exit" the water by 40 to 45 years old; thus, the 27 year old worker had a worklife expectancy of 13 to 18 years.
Thereafter, however, the trial court stretched the word "capacity" to encompass the "assumption" that the yet to be diver tender would undertake a 2 year training course necessary to complete the requirements to become a diver. (This position would also entitle him to an income of $45,000 per year, considering his abilities as a certified welder). The court then made the inferential leap that appellee's future capacity as a diver, would potentially qualify him for a cross-over position as foreman, supervisor, or salesman in the oil industry. The transfer of appellee's potential job qualification as a future diver to different opportunities in the oil industry does not appear to be substantiated by expert testimony. Given these assumptions, the court found, by speculation, that after appellee had permanently exited from the water as a diver, he would have been able to continue to earn $45,000 per year throughout his life expectancy.
Although actual earnings are not necessarily determinative of earning capacity, damages should be estimated on the injured person's ability to earn money, or his earning power. See Folse v. Fakouri, 371 So.2d at 1123. Mr. Hollenbeck did not possess the earning power of the position of diver at the time of the injury. Indeed, at this early stage of employment as a new tender, he had not even taken the test to qualify as a diver tender. The prospect that he would commence, much less complete, the requisite two year educational training course to become one of the relatively small percentage of tenders who advances to the level of diver, and, thereafter, upon exiting the water, becomes a supervisor, foreman, or salesman is speculative at best. It certainly does not rise to the level of a probability. Nor is it reflective of appellee's earning power or his "earning capacity", for which one is entitled to an award for impairment or diminution. See Coco v. Winston Industries, Inc., 341 So.2d 332, 338 (La.1976).
Accordingly, I would limit Mr. Hollenbeck's award for loss of future earnings to the difference between the $45,000 per year that he could have earned as a diver tender, or as a diver, for 18 years (the work-life expectancy established by the trial court based upon expert testimony) minus the sum that he can currently earn post-accident for the same period of time. This represents the highest reasonable award within the sound discretion afforded the court.
NOTES
[1] Plaintiff's original petition also named National Union Fire Insurance Company, Oceaneering's alleged insurer, as a defendant. However, on plaintiff's motion, National Union was subsequently dismissed without prejudice, and in a supplemental petition, Liverpool and London Steamship Protection and Indemnity Association, Ltd. was named as a defendant, as Oceaneering's alleged insurer.
[2] In his brief, plaintiff argues that the trial court erred in assigning any percentage of fault to him. However, plaintiff neither appealed the trial court's judgments, nor answered the appeal in this matter. Thus, plaintiff may not seek to amend the judgment in his favor. LSA-C.C.P. art. 2133; Roger v. Estate of Moulton, 513 So.2d 1126, 1135-1136 (La.1987) (on rehearing); Bond v. Allemand, 632 So.2d 326, 332 (La.App. 1st Cir.1993), writ denied, 94-0718 (La.4/29/94); 637 So.2d 468.
[3] Once again, plaintiff argues in brief that the trial court's award should be amended in his favor, averring that the trial court erred in not accepting the calculations of Dr. Rice without adjustment. However, as stated above, because plaintiff neither appealed the trial court's judgments, nor answered the appeal in this matter, he may not seek to amend the judgment in his favor. LSA-C.C.P. art. 2133; Roger v. Estate of Moulton, 513 So.2d 1126, 1135-1136 (La. 1987) (on rehearing); Bond v. Allemand, 632 So.2d 326, 332 (La.App. 1st Cir. 1993), writ denied, 94-0718 (La.4/29/94); 637 So.2d 468.
[4] In performing the calculation at issue, the trial court stated that it was calculating the award "as the Court understands how that is to be computed." The trial court's actual calculations are not set forth in the appeal record.
[5] It is noteworthy that this figure did not include hospitalization and surgical costs related to plaintiff's surgery.