CALLOWAY, J.
|2In this personal injury case, the defendants challenge the general damages awarded by the trial court to the plaintiff following a bench trial.
FACTS AND PROCEDURAL HISTORY
This case involves a traffic accident that occurred on December 9, 2013, when the Ford F-250, operated by the defendant, Justin Wascom, Jr., owned by his employer, Clean Water Opportunities, Inc, (“Clean Water”),[2] and insured by Hallmark Specialty Insurance Company (“Hallmark Insurance”), rear-ended the Jeep Liberty owned and operated by the plaintiff, Ev-ette Neal.[3] Mr. Wascom was driving the Ford F-250 eastbound on Interstate 12 in *131 Livingston Parish when he rear-ended Ms. Neal’s Jeep, causing her vehicle to hit the side concrete wall, leave the roadway, flip over, hit a tree, and come to rest in a canal.
Ms. Neal filed the instant suit against Mr. Wascom, Clean Water, and Hallmark Insurance, seeking damages for injuries to her neck, back, head, shoulders, legs, chest, sternoclavicular (“SC”) joint, collarbone, hands, and fingers allegedly sustained as a result of the automobile accident. A bench trial was conducted on March 15, 2016, on the issue of damages.[4] At trial, the parties stipulated to liability and insurance coverage, that Ms. Neal’s medical expenses totaled $27,834.00, and that her lost wages totaled $4,576.00. Following trial, the trial court signed a final judgment on April 1, 2016, in favor of Ms. Neal and against Mr. Wascom and Hallmark Insurance in solido, awarding Ms. Neal: $700,000.00 in general damages; $27,800.34 in past medical expenses; $21,000.00 in future medicals for SC injections; $5,600.00 in future medicals for acromioclavicular (“AC”)[5] injections; $426.79 for certified medical records and bills; $4,576.00 in lost wages; legal interest from the date of judicial demand until paid; all Rcosts of the proceedings; a $5,000.00 expert witness fee; and dismissed all of Ms. Neal’s claims against Clean Water, with prejudice.
Mr. Wascom and Hallmark Insurance now appeal, assigning error to the amount of general damages awarded to the plaintiff.
LAW AND DISCUSSION
The defendants argue the trial court abused its discretion in awarding Ms. Neal $700,000.00 for a partially dislocated SC joint, a strained shoulder, a strained neck, and a strained back. The defendants assert the accident merely aggravated Ms. Neal’s preexisting neck and shoulder injuries, that she only missed one month of work, and that she now has full range of motion in her shoulder and arm.
“General damages” involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La. App. 1 Cir.), writs denied, 605 So.2d 1373, 1374 (La. 1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304 (La.App. 1 Cir. 5/5/95), 655 So.2d 431, 437.
Vast discretion is accorded the trier of fact in fixing general damage awards. La. C.C. art. 2324.1; Hollenbeck v. Oceaneering Int., Inc., 96-0377 (La.App. 1 Cir. 11/8/96), 685 So.2d 163, 172, writ denied, 97-0493 (La. 4/4/97), 692 So.2d 421. The discretion vested in the trier of fact is “great,” even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). The role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award but, rather, to *132 review the exercise of discretion by the trier of fact. Wainwright v. Fontenot, 2000-0492 (La. 10/17/00), 774 So.2d 70, 74. Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the trier of fact abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La. 1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. Youn, 623 So.2d at 1261. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award. Youn, 623 S.o.2d at 1261.
The nature, relative severity, and bodily extent of injuries are qualitative factors that must first be considered by the trier of fact in awarding general damages. The duration of a plaintiffs injury symptoms and the duration of treatment are relevant quantitative factors that must also be taken into account. See Gillmer v. Parish Sterling Stuckey, 2009-0901 (La. App. 1 Cir. 12/23/09), 30 So.3d 782, 788; Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1 Cir. 11/10/94), 647 So.2d 351, 3571 Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate or excessive. See Theriot, 625 So.2d at 1340. And, it is only after such a threshold determination of an abuse of discretion is made that the appellate court should examine prior awards for similar injuries to modify, the award within the range of reasonable discretion. See Reck v. Stevens, 373 So.2d 498, 500-01 (La. 1979); Coco v. Winston Indus., Inc., 341 So.2d 332, 335-36 (La. 1976).
The record establishes that Ms. Neal was forty-seven years old at the time of the accident. Ms. Neal had been involved in one motor vehicle accident prior to the December 2013 accident, which occurred on March 2, 2005, in which she suffered injuries to her neck; however, she made no Claims for bodily injury or property damage as a result of that accident.
Ms. Neal’s medical records were introduced at trial. Prior to the December 9, 2013 accident, Ms. Neal treated with Lallie Kemp Regional Medical Center. Following the accident at issue herein, Ms. Neal treated with Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana, the Baton Rouge Clinic, Dr. F. Allen Johnston at the Louisiana Ortho-paedic and Spine Institute, and Advanced Therapy Solutions.
Immediately following the accident, Ms. Neal was transported by ambulance to the emergency room at Our Lady of the Lake Regional Medical Center. The notes from the emergency room indicate that Ms. Neal presented with left shoulder pain, a laceration to her left scalp, blunt trauma to her left shoulder, and moderate bleeding. The emergency room physician diagnosed Ms. Neal with a head, injury, scalp laceration, head contusion, and contusion of the left shoulder. Ms. Neal received five staples in her scalp to close the wound. The physician instructed Ms. Neal to schedule a follow up visit with the clinic in two to three days but immediately to return to the emergency room if her symptoms worsened.
Dr. Johnston,[6] the plaintiff, and her mother, Ms. Cook, testified at trial. Dr. Johnston testified that he first saw Ms. *133 Neal on January 7, 2014, one month after the accident, and that she complained of ongoing pain' in her left-upper quadrant, specifically her shoulder and neck. Dr. Johnston testified that as a result of the accident, Ms. Neal had a tender and enlarged SC joint, which is the point where the sternum, or- breastbone, meets the clavicle, or collarbone. Dr.-Johnston’s testimony and notes indicate that Ms. Neal had restricted range of motion in her shoulder, which rendered her unable to fully lift her arm, and that most significantly, she suffered pain due to a subluxation of the left SC joint, ie., a partial dislocation of the SC joint. He also noted Ms. Neal had a strained neck and lower back. After reviewing X-rays of Ms. Neal’s neck, shoulder, and collarbone, Dr. Johnston prescribed a treatment of physical therapy and medication[7] and advised her to modify her activity and working conditions to prevent aggravation of her injuries.
On March 13, 2014, at Ms. Neal’s second visit with Dr. Johnston, he observed that she had swelling around the SC joint, but that it was less severe than her first visit with him one month after the accident. Dr. Johnston testified that he gave Ms. Neal an | fiepidural steroid injection (“ESI”) in her shoulder, specifically her AC joint, in an attempt to determine if her pain was isolated in her shoulder or in her SC joint.
On Ms. Neal’s third visit on June 2, 2014, Dr. Johnston noted that the ESI in her shoulder did not alleviate her pain, so he ordered an MRI of her neck and SC joint. The MRI of Ms. Neal’s neck was done oh June 17, 2014. Dr. Johnston testified the results of the neck MRI showed mild desiccation, or drying out of the C-5 and C-6 intervertebral discs, which is not unexpected for a person in her mid-to-late forties. The MRI of Ms. Neal’s SC joint was done on June 27, 2014; the results indicated-that Ms. Neal had fluid in the SC joint, which Dr. Johnston classified as a “healing injury.”
Dr. Johnston testified:
I think she’s got a painful [SC joint], and I’m hoping that with time her symptoms will improve, you know. I don’t know— there’s a percentage of people that you can say are going to get better over time. There is—some will. The joint will stay out of place, but maybe they don’t use their arm as much. For whatever reason, it becomes less symptomatic. But a significant portion of people, probably greater than 50%, once it’s dislocated, they’re going to have some symptoms with it.
Following Ms. Neal’s fourth visit on July 1, 2014, Dr. Johnston suggested that Ms. Neal receive ESIs in her AC joint and that she continue to modify her activity in order to alleviate her pain. After a fifth visit on July 29, 2014, Dr. Johnston scheduled Ms. Neal for an SC injection on August 11, 2014. In a follow-up visit on August 28, 2014, Dr. Johnston noted that the SC injection was successful as Ms. Neal experienced pain relief. Dr. Johnston stated he saw Ms. Neal again on October 9, 2014, at which time he noted that while she was still experiencing pain relief as a result of the SC injection, she would still have occasional flare ups of pain whenever she pushed or applied pressure to the SC area. He testified that Ms. Neal continued to have range of motion issues with her shoulder and had developed a mass, or bump, over her SC joint.
Dr. Johnston testified he saw Ms. Neal on June 4, 2015, and she complained of *134 neck discomfort and pain in her SC joint. Dr. Johnston testified that by that time, the effects of the SC injection had begun to wear off. He noted that she had weakness and tenderness in her shoulder and that its range of motion was “not what it should be.” After |7a second MRI of her shoulder was performed on June 15, 2015, Dr. Johnston testified that the results showed fluid and inflammation in her shoulder and AC joint, which he concluded meant she had an “actual problem inside-her shoulder,” and not just referred or radiating pain from the neck, which had been his initial hunch following the March 2014 visit. Dr. Johnston testified that the injuries to Ms. Neal’s shoulder, which includes the glenohumeral joint, the AC joint, and the SC joint, were all “problematic” and were “all contributing to each other.” Ms. Neal saw Dr. Johnston again on July 2 and September 1, 2015, when she received another AC injection. On her last visit prior to trial, January 7, 2016, Dr. Johnston stated that Ms. Neal continued to experience neck, shoulder, and right upper back pain. Dr. Johnston testified that her back pain likely developed as a result of her overcompensating for the injuries to the left side of her body.
Dr. Johnston testified that as a result of the accident, Ms. Neal’s left-upper quadrant injuries—comprised of injuries to her neck, shoulder, and SC joint—contributed to the bulk of her pain. He testified that her partially dislocated SC joint and her shoulder injury were the major injuries causing her symptoms and pain; and, that although some of her neck pain was due to age-related arthritis, the accident of the type experienced by her on December 9, 2013, when her vehicle rolled over, is “not forgiving,” and also contributed to the left-upper quadrant pain.
Dr. Johnston testified that due to the partially dislocated SC joint Ms. Neal suffered as a result of the accident, she will experience pain any time she lifts her left arm above ninety degrees, that is, “above chest height,” or above “chest—breast level.” Although not impossible for her to fully lift her arm, Dr. Johnston testified that it would be inadvisable for her to do so, and that she would naturally self-limit to prevent pain. The restrictions to her activities Dr. Johnston prescribed as a part of her treatment included prohibitions from lifting her arm, climbing, lifting more than twenty pounds, and working at unprotected heights, as well as any activity when her left arm becomes a weight-bearing joint, such as getting on the floor playing with children, doing push-ups, or other such exercises. Dr. Johnston confirmed at trial that Ms. Neal’s SC joint would never be back to normal, that she is at maximum medical improvement, and that Ms. | «Neal will live with the injury and pain for the rest of her life. He stated that he would see Ms. Neal three or four times a year for the rest of her life to monitor her injuries, perform AC and SC joint injections, and ensure she is able to tolerate her medications.
Ms. Neal testified that as a result of the December 9, 2013 accident, she suffers from headaches, pain in her left side, back pain, has trouble sleeping due to head and neck pain, and is unable the fully lift her left arm, which restricts her ability to perform tasks with the left side of her body such as lifting or reaching for objects, playing sports, restocking shelves, and other job-required activities, brushing her hair, picking up her grandchild, or dressing herself without pain. Ms. Neal also testified and showed the court a permanent knot she has on her left shoulder over the AC and SC joints. Ms. Neal and her mother testified that following the accident, Ms. Cook cared for her daughter for approximately four weeks because Ms. Neal was unable to do anything for herself, *135 including dress, eat, bathe, or use the bathroom unaided.
At the end of the bench trial, the trial court gave oral reasons for its ruling:
The motor vehicle accident defendant, Mr. Wascom, was at fault in the car accident insured by the insurance Company which was stipulated to and the parties stipulated to the liability and coverage on Mr. Wascom. The witness, Dr. Johnston, to whom the parties stipulated his expertise in orthopaedics, saw the plaintiff numerous times [... ] [Dr. Johnston] testified about the ongoing— the diagnosis, the prognosis, and the ongoing meds, injections, and visits that the plaintiff would have—yes [...] The expert opinion is that plaintiff sustained injury to her SC joint, left shoulder, AC joint because of the motor vehicle accident December 9, 2013. Her neck was more stiff because of age and the motor vehicle accident as a result of a blow to the head. This is a permanent injury. He found no preexisting shoulder problems or—and this was a left upper quadrant injury. He’s testified the plaintiff should avoid lifting, getting up from the ground, putting any kind of weight on the left upper quadrant, left shoulder. The plaintiffs options for treatment on the SC joint dislocation would be surgery within the first three weeks. That’s very rarely done, dangerous, risky to the patient, and it causes severe pain and severe scarring to the patient. That was not able to be done. The plaintiff didn’t see the doctor within those three weeks[,] but it’s unlikely he would have advised that anyway. The prognosis is the SC joint of the plaintiff will never be normal, or back in place. Her range of motion will always be painful, and plaintiff is at maximum medical improvement. The plaintiff will be on meds from now on, both prescription meds and over-the-counter meds. Future surgery is possible and the plaintiffs |3neck will continue to age and be problematic. The witness testified the plaintiff can tolerate her injuries if she is careful about how she moves and continues with the pain medication program she is on. The witness testified the plaintiffs range of motion on the left side is below one hundred eighty degrees because of the pain it will cause. He said—practically, I think he said she could go on to the one hundred and eighty degrees, but it’s inadvisable for the plaintiff to go to the hundred and eighty degrees. Below ninety degrees would be the ideal range of motion the plaintiff could—should do with this injury. The witness also expected pain for the plaintiff at eighty degrees on the left shoulder. Future treatments he testified about, medical, medications, injections, liver/kidney function studies, lab tests, witness will see three to four times a year for the rest of the plaintiffs life. Witness will—Dr. Johnston will see plaintiff for the injury two to four times a year for the rest of her life. Maybe more injections, and he testified about the ongoing SC joint injections, AC joint injection, shoulder injections, and possibly a facet injection which is very expensive. But that’s—that was a possibility. He didn’t deal in probabilities with that, so I didn’t figure that in the future medical. Also, the plaintiff herself testified about her ongoing pain. Said the pain is horrible in her shoulder. The reason she hasn’t consistently had the shots was after the shots[,] the pain is horrible for four or five days, and after that, she would get somewhat tolerable relief from the pain. She cannot play basketball anymore. She cannot lift her grandchild. She cannot do normal dressing and undressing without pain or without help. She cannot do housework— normal housework she used to do with *136 out help or without pain. Her work— she’s testified she works through the pain or she has assistants. Since she is a Supervisor at Wal-mart, she can ask for help to do some of her job activities. So for all these reasons—and her mother testified about, you know, she couldn’t hardly lift her arms over her head at that point. After the accident, she couldn’t do anything for herself. There was ongoing problems, and there are still ongoing Problems that the mother sees her two to three times a week and still sees. Also, Ms. Neal mentioned about the dressing. She has had to change her mode of what she wears. She cannot wear pullover shirts because she cannot lift her arms over her head. Likely never will be for the rest of her life, so she has to have button on—button up shirts, and so on. Grooming, brushing her hair, simple things like that she has to ask for help because of the pain issue with that left arm being lifted above the head. She’s unable to do so, or unable to do so without pain. So, for all those reasons, I find for the plaintiff in these amounts.
Based on our review of the record, we cannot say the trial court manifestly erred in accepting and relying on the evidence entered into the record at trial and the trial testimony of Ms. Neal, Ms. Cook, and the expert medical testimony of Dr. Johnston. See Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc., 99-0201 (La. 10/19/99), 748 So.2d 417, 421, 425.
The trial court awarded Ms. Neal $700,000.00 in general damages. The trial court’s oral reasons demonstrate the court considered the nature, relative severity, and bodily extent of Ms. Neal’s injuries, as well as the continuing duration of her symptoms and treatment. Based on our review of the record, we cannot say the trial court’s award for general damages represents an abuse of its vast discretion.
DECREE
Based on the foregoing, we affirm the April 1, 2016 judgment of the trial court. All costs of this appeal are assessed to the defendants, Justin Wascom, Jr. and Hallmark Specialty Insurance Company.
AFFIRMED.
McDONALD, j., dissents

. At trial, the parties did not stipulate that Mr. Wascom was in the course and scope of his employment with Clean Water at the time the accident occurred.

.Hallmark Insurance insured the Ford F-250 owned by Clean Water. The insurance policy, LAA801078, had liability limits of $1,000,000.00 per accident.

. A week prior to trial, the trial court granted partial summary judgment in favor of the defendants as to Ms. Neal’s claims for punitive/exemplary damages. See La. C.C.P. arts. 1915(A)(1), (A)(3), 1915(B), and 966(E).

. The AC joint is at the top of the shoulder where the shoulder meets the clavicle.

. The parties stipulated to Dr. Johnston’s expertise in orthopedics.

. Dr. Johnston prescribed Mobic, an anti-inflammatory; Ultram, for pain; and Flexeril, a muscle relaxer.