546 So.2d 919 (1989)
Kathleen Wells KEATING, Vernon Earl Patrick Keating, and Thomas William Keating, Plaintiffs-Appellees,
v.
HOLSTON'S AMBULANCE SERVICE, INC. and Safeco Insurance Company, Inc., Defendants-Appellants.
No. 88-278.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1989.
*920 Scofield, Bergstedt, David Hoskins, Lake Charles, for plaintiffs/appellees.
Frunderburk & Andrews, Arthur B. Andrews, Baton Rouge, Voorhies & Labbe, Thomas B. Hightower, Poteet & Landry, Walter Landry, Lafayette, Stockwell, Sievert, Thomas B. Henning, Raggio, Cappel, Stephen A. Berniard, Lake Charles, for defendants/appellants.
Before STOKER, YELVERTON and KNOLL, JJ.
YELVERTON, Judge.
Vernon Earl Keating was killed when an ambulance ran into his car in September 1985. Kathleen Wells Keating, Vernon Earl Patrick Keating, and Thomas William Keating, the wife and sons of the deceased, sued for damages for wrongful death. The defendants were Holston's Ambulance Service, Inc., and its primary and excess insurers, Safeco Insurance Company and Chicago Insurance Company. A jury found the ambulance service solely responsible for the accident, and cast the defendants in judgment for damages in the total of $450,000. From this judgment, defendants have appealed. The Keatings answered the appeal seeking an increase in the award. We affirm the jury award without change.
The ambulance company and its primary insurer, Safeco, raise seven assignments of error. Five of these relate to alleged errors by the presiding judge in the conduct of the jury trial. The other two urge that the jury was clearly wrong in its assessment of fault, and that it abused its discretion in its award of damages. During oral argument, able counsel for the defendants chose to address what we agree are the two most important issues on appeal, liability and quantum. This opinion will likewise be limited to those issues. Since we *921 regard the remaining five assignments as raising issues of relatively less significance, we will address those by way of an unpublished addendum to this opinion.
This fatality occurred on the afternoon of September 25, 1985, south of Lake Charles on a state highway locally known as Country Club Road, a two-lane highway running east and west with a blacktopped surface about 20 feet wide. The accident happened at an intersection with a parish road. North of Country Club Road the intersecting highway is known as Ihles Road; south it is Elliott Road. Vernon Keating, alone in his 1977 Oldsmobile two-door automobile, had been driving west on Country Club Road and was in the process of turning left onto Elliott Road. The ambulance was likewise heading west, and it was in the passing lane when the collision occurred. A front corner of the ambulance hit Keating's car directly in the driver's door. Keating died instantly.
Country Club Road is straight for a distance of one mile on either side of the intersection. Flashing yellow caution lights were hanging at the intersection to control the movement of traffic on Country Club Road. The intersection was also marked as a no passing zone. Between its intersections with Nelson Road and Big Lake Highway, Country Club Road goes for two miles straight. The intersection where this accident happened is right in the middle of that two mile stretch, and it is the only intersection marked with a caution light and a no passing zone.
The posted speed limit at the intersection was 50 miles per hour. The ambulance laid down skid marks of about 80 feet before the collision, and pushed the Keating vehicle another 70 feet after the collision. The accident happened directly in the intersection on the south side, or eastbound lane, of Country Club Road. It was established that the ambulance was going at least 54 miles per hour when its brakes locked. Its speed at the point of impact was estimated at 38 miles per hour. Keating's car was thought to be going seven or eight miles an hour in the turn.
The ambulance was driven by Michael Lee Meyers and attended by Chad Halstead. It was in route to the home of an elderly patient, Raymond Benoit, to transport him to a local hospital for what the evidence rather conclusively established was a non-emergency transport. The ambulance driver and the attendant were familiar with the area, since they had collected the same patient less than a week before on another non-emergency call.
Keating, a 66 year old longtime resident of Lake Charles, was likewise familiar with the intersection. He was in route to a destination on Elliott Road.
At the trial the eyewitness accounts of what the vehicles were doing leading up to the accident were in considerable conflict. There were four eyewitnesses. The two occupants of the ambulance were the witnesses for the defendants. Dr. Frederick L. Bercier and William J. Bennett were the witnesses for the plaintiffs. Dr. Bercier was driving east on Country Club Road, coming toward the direction of travel of Keating and the ambulance. He went through the intersection immediately before Keating turned left across his wake, and Bercier, watching the ambulance in his rear view mirror, actually saw the collision happen. Another witness, William J. Bennett, also saw it happen but from a different angle; he was headed south approaching the intersection on Ihles Road, and was about two car lengths from the intersection when it took place.
There were additional witnesses who testified on the subject of whether the ambulance had its siren in operation before the accident. Also, because of the conflicting versions of the facts, both sides used the testimony of accident reconstruction experts.
The ambulance driver, Meyers, gave the following jury testimony regarding what happened immediately preceding the collision. He said that he and Keating were both going west in their proper lane of travel, and that when he caught up with Keating he reduced his speed to forty miles per hour. Keating moved to the shoulder of the road, his right wheels off the pavement *922 and on the shoulder. They traveled like this for several hundred feet, down to just before the intersection. Meyers testified that all this while the ambulance had its flashing lights on and the siren was going constantly in the "yelp" mode. He said that Keating went several hundred feet with his right tires on the shoulder, off the highway itself, and when Keating was close to the intersection, Keating pulled completely off the road as far to the right as he could get. Meyers said that when he saw Keating move as far to the right as he could get, and saw that he was going very slowly, he moved the ambulance to the center of the highway, speeded up, and began to pass. It was then, according to the ambulance driver, that Keating, two car lengths from the intersection, suddenly began a left turn from the far side. He testified that Keating's turn was a sharp movement and not at all a normal left turn maneuver. He said he moved the ambulance on over to the passing side as an evasive maneuver and applied the brakes.
The physical evidence revealed that the collision was in the intersection, with both vehicles in the south, or eastbound lane of Country Club Road.
The accident could not have happened the way that the ambulance attendant, Halstead, testified. He said that he became aware of the Keating vehicle as they started to go around it. He first took notice of the Keating car when the ambulance was 20 yards away from the intersection. The Keating vehicle was then half on the shoulder and half on the road. The ambulance was passing, straddling the center lane going around Keating, the front of the ambulance about even with Keating's back door. It was then that the Keating vehicle came off the shoulder of the road and started to make a left turn in front of the ambulance. The ambulance attendant was as sure as the driver that the siren was operating continuously and that it was in the "yelp" mode.
There were six witnesses who testified that the siren was not sounded at all before the collision. Dr. Bercier passed within ten feet of the ambulance just before the collision, and he was certain that the siren was not in operation. Mr. Bennett, another eyewitness, going south on Ihles Road, was two car lengths from the intersection and saw the collision. He said there never had been a siren. Additionally the witnesses Sandy Hilbun, Danny Morgan, Brian Zampini, and Billy Ezell, testified that they were in the vicinity of the scene of the accident and heard the collision itself, and that there was no siren preceding the collision.
The plaintiffs' witnesses also disagreed with the ambulance occupants as to the location of Keating's vehicle with reference to the highway when it began its left turn. The testimony of Dr. Bercier and that of Bennett was that Keating was on the highway and not on the shoulder when he began his left turn. Bennett said it looked to him as though Keating was near the centerline when he started turning.
The ambulance driver testified Keating gave no signal for a left turn, but Dr. Bercier stated that he knew Keating was going to turn left. When Dr. Bercier first became aware of the ambulance and Keating's car, he was approaching the intersection from the opposite direction half a mile away. There was no traffic between them. Both oncoming vehicles were in the westbound lane. Dr. Bercier testified that as he approached the intersection he knew, for some unremembered reason, that Keating was about to turn left. In fact, Dr. Bercier declared that he took his foot off the accelerator and watched Keating closely as he passed him in the opposite lane. He could not remember whether it was Keating's left hand turn signal, or something else, that indicated to him that Keating was about to turn left, but he testified with conviction that he knew Keating was about to turn left. He said that immediately after he and Keating passed each other, Keating began his left turn. He explained that after he passed the intersection, the ambulance was in the middle of the highway east of the intersection, so Bercier moved to the right shoulder and slowed down. When they passed each other the ambulance was going very fast, and Bercier, *923 looking back into his rearview mirror, saw the accident develop and take place.
Although there were two accident reconstruction experts testifying, one for each side, neither actually testified to a reconstructed scenario of what happened. John Rigol, for the plaintiff, was of the opinion that the accident could not have happened the way the ambulance driver testified, with Keating's car commencing its left turn from the far right shoulder of the road. If that had occurred, according to Rigol, Keating would not have been killed, because the ambulance driver would surely have had sufficient time to react.
Olin K. Dart, the expert for the defendants, answered a few specific questions, such as estimated speeds. He testified that his assumptions (and conclusions, whatever they were) differed from those of plaintiff's accident reconstruction expert in only one significant respect, and that was the location of Keating's car when it began its turn. Dart assumed that it was off the road, on the right side, as far as it could get. Plaintiffs' expert, Rigol, assumed it was entirely on the road, in the right lane, where a car would normally be just before it began a left turn. Based on the skid marks, the weight of the ambulance, and other relevant factors, both these experts agreed on the speed of the vehicles, saying that the ambulance was going at least 54 miles per hour at the time the brakes were engaged. Rigol testified that this was a conservative estimate and explained that at some point just before the brakes were engaged the speed was even greater because during the reaction time of the driver before he engaged the brakes, his foot was off the accelerator and the ambulance was decelerating.
On this appeal the defendants complain that the jury was clearly wrong in its finding that the ambulance driver was negligent, and that it was also clearly wrong in failing to assess any fault to the deceased. We will examine these two findings of the jury, bearing in mind the clear error standard of appellate review on credibility determinations and findings of fact, and bearing in mind also these axiomatic rules: the burden of proof was on the Keatings to prove the negligence of the ambulance driver, and the burden of proof was on the ambulance company to prove the contributory negligence of the deceased.

NEGLIGENCE OF THE AMBULANCE DRIVER
Statutory law prohibits passing in no passing zones and within 100 feet of intersections. La.R.S. 32:76 and 32:77. A driver approaching an intersection controlled by a flashing yellow light is under a duty to exercise a greater degree of care and caution. La.R.S. 32:234; Great American Ins. Co. v. Turnage, 339 So.2d 1322 (La. App. 1st Cir.1976). Nevertheless, emergency vehicles enjoy certain privileges under the conditions as specified by La.R.S. 32:24, the relevant portions of which are here quoted:
Emergency vehicles; Exceptions
A. The driver of an authorized emergency vehicle, when responding to an emergency call, ... may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver of an authorized emergency vehicle may:
. . . . .
(3) Exceed the maximum speed limits so long as he does not endanger life or property;
(4) Disregard regulations governing the direction of movement or turning in specified directions.
C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach, ...
D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.
As the statute says, the privileges set forth may be invoked by the driver of *924 an emergency vehicle (1) only if he is responding to an emergency call, and (2) only if he is using audible or visual signals, or both, which are sufficient to warn and alert other drivers of his approach. Prather v. Gautreaux, 297 So.2d 439 (La.App. 3rd Cir. 1974). Whether the emergency vehicle is on an emergency call, and whether the warnings utilized are sufficient to alert other motorists to the approach of the vehicle are questions of fact which must be determined in light of all the circumstances of the case. Id.
There was substantial evidence before the jury that this was not an emergency call. Although there was testimony on the ambulance company's side that its driver believed this was an emergency situation, there was also substantial credible testimony (the patient's doctor and the relative who called for the ambulance) to indicate that the ambulance personnel could not have believed that this was an emergency call. Thus, the jury might have reasonably concluded that the driver of the ambulance was not responding to an emergency call and was therefore not entitled to the benefit of the exceptions granted under R.S. 32:24, supra.
Even if this was an emergency call, the jury could have reasonably concluded that the driver was not exercising the privileges in accordance with the conditions required by the statute. The ambulance was exceeding the speed limit, and attempting to pass in an intersection, in a no passing zone, and under a caution light.
The jury could also have concluded that the ambulance driver should have seen, just as did Dr. Bercier, that Keating was intending to turn left, and should have made that observation in time to avoid the accident. The jury could have concluded that it was negligence for the ambulance driver to increase his speed from below the speed limit to a speed in excess of the limit in order to accomplish this dangerous passing maneuver. The jury could have concluded that the siren was never sounded, before or while the ambulance followed Keating for several hundred feet, matching his speed, and that a siren was mandated when the ambulance decided to speed up and pass. It could be assumed that Keating was aware the ambulance was following him, but that since it had not passed him for some distance while it had a safe opportunity to pass, the driver did not want to pass. The jury could have believed Keating was led to believe he could get back on the road and safely make his turn. The jury could have concluded that under these circumstances the ambulance driver owed Keating the duty of at least sounding his siren, when the driver decided to speed up and pass.
The defendants argue the application of Riggs v. State, 488 So.2d 443 (La.App. 3rd Cir.1986), where this court affirmed a trial court decision that a left-turning driver, whose vehicle was struck by a state police car, was solely at fault. The facts of that case are clearly distinguishable. Mrs. Riggs was turning into a private drive, and she had ample notice, and knew that the police car, which never changed its course or its speed, intended to pass her.
The jury's conclusion that the ambulance driver was negligent is supported by the evidence.

CONTRIBUTORY NEGLIGENCE
The jury found that the deceased was not negligent at all. The defendants argue that this finding was clear error, arguing that Keating (1) failed to comply with his duty on the approach of an emergency vehicle, and (2) failed to exercise due care in making a left turn.
A close examination of the evidence convinces us that the jury did not commit clear error in concluding that the defendants failed to prove that Keating was negligent on the particular facts of this case.
La.R.S. 32:125 reads as follows:
Procedure on approach of an authorized emergency vehicle
A. Upon the immediate approach of an authorized emergency vehicle making use of audible or visual signals, or of a police vehicle properly and lawfully making use of an audible signal only, the driver of every other vehicle shall yield *925 the right of way and shall immediately drive to a position parallel to, and as close as possible to, the right hand edge or curb of the highway clear of any intersection, and shall stop and remain in such position until the authorized emergency vehicle has passed, except when otherwise directed by a police officer.
B. This Section shall not operate to relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons using the highway.
According to the ambulance driver, Keating substantially complied with his duty under the above quoted statute. He pulled to the right with two wheels on the shoulder of the road, and began to slow down. He did not stop, but for several hundred feet the ambulance had a clear opportunity to pass him. The evidence shows that during that time there was no other traffic in the vicinity and nothing to prevent the ambulance from passing. Not only did the ambulance not pass during that several hundred feet, but it even reduced its speed and followed Keating for several hundred feet. Although Keating did not stop, as he was technically required to do by the statute, the jury could have reasonably concluded that the failure to come to a complete stop was not a cause-in-fact of the accident.
The jury could have concluded that the ambulance driver's actions in slowing down and following Keating, albeit continuing to display its flashing lights, coupled with its failure to pass Keating when it had every opportunity, could have signaled to Keating the message that the ambulance was not in a hurry, and did not want to pass him, and that it intended to turn at the intersection, either north on Ihles Road or south on Elliott Road. Based on the ambulance driver's conduct, those inferences would have been reasonable. Under those circumstances Keating may have been justified in returning to the highway and going about his business.
That the sudden maneuver of the ambulance in moving to the passing lane and at the same time speeding up to 54 miles per hour was the cause-in-fact of the accident is supported by the testimony of the plaintiff's expert, who testified that had the ambulance driver maintained his speed of 40 miles per hour, the accident would probably not have happened. (At one point in his testimony the ambulance driver estimated his speed, before he speeded up to pass, as in the range of 40 miles per hour. Although it is hard to reconcile this speed with the driver's further testimony that when he caught up with Keating he reduced his speed to 40 miles per hour, and that he then followed Keating for several hundred feet, with Keating all the while slowing down, the expert accepted the 40 mile per hour estimate and used it in his calculations.)
We turn next to the jury's determination that Keating's left-turn maneuver was proper under the circumstances. Although it is well settled that a motorist who attempts to make a left turn from a public highway is required to ascertain in advance that the way is clear and that the turn can be made safely and without endangering overtaking or oncoming traffic, it is also well settled that the left turning motorist has the right to assume that traffic to the rear will follow the law and common sense and maintain a proper lookout. Cassity v. Williams, 373 So.2d 586 (La.App. 3rd Cir.1979). See also Carpenter v. Hartford Acc. & Indemn. Co., 333 So.2d 296 (La.App. 1st Cir.1976).
A case from this circuit involving a left-turning driver and a passing emergency vehicle, with both its audible and visible warnings in operation, is Natchitoches Motor v. Travelers Ins. Co., 372 So.2d 811 (La.App. 3rd Cir.1979). The trial court found that the driver of the emergency vehicle was solely at fault in the collision, and this court affirmed, saying,
There is no presumption ... that the driver of a left turning vehicle is guilty of negligence. Both a left turning and a passing motorist are charged with an exceptional duty of care. Whether there *926 has been a breach of duty on the part of either must be proved.
. . . . .
In judging whether a left turn can be made in safety, the motorist has the right to assume that a following motorist will observe all the duties imposed upon him by law and common sense. Thus, he may assume that the following motorist will proceed within the speed limit and will not cross over a yellow line in his traffic lane marking a `no passing' zone and, moreover, will keep a proper lookout.
The duty of a motorist to yield the right-of-way to emergency vehicles only arises when the motorist observes or hears, or under the circumstances should have observed or heard, the audible and/or visual warnings of the emergency vehicle. Id. In the Natchitoches Motor case the emergency vehicle came from behind another car and speeded up as it entered the passing lane, and the turning vehicle had already begun to execute its left turn when the emergency vehicle began its passing maneuver.
Similarly, the jury in the present case could have found that Keating indicated his intention to turn left (the same warning manifested to Dr. Bercier), that Keating was justified in believing that the ambulance, having reduced its speed to match his and failing to take the opportunity to pass him before they approached the intersection, would not try to pass in the intersection itself in the face of a yellow flashing caution light and in a no passing zone, and would allow him to complete his left turn in safety. When Dr. Bercier and Keating finally closed on each other, and passed, Keating could have reasonably believed that he could turn left in the wake of Dr. Bercier's passage and get out of the apparently unhurried way of the ambulance. The jury could have reasonably concluded that from Keating's standpoint, it was totally unexpected that the ambulance would suddenly accelerate to 54 miles per hour and at the same time enter the passing lane moments after Dr. Bercier had passed, without at least putting its siren into operation to warn Keating that it had changed its mind and was going to pass him.
The improbable and inconsistent explanations of their conduct by the ambulance driver and his companion do nothing to dispel the reasonableness of this scenario of what could have happened. We find no clear error in the jury's finding that the deceased was not negligent.

THE AMOUNTS OF THE AWARDS
The verdict sheet damage interrogatories were not itemized except to require separate awards for the widow and each of the two sons. Accordingly, the jury found that Kathleen Keating suffered total damages of $400,000, and that each of the two sons sustained damages of $25,000. Both sides appealed the awards, one arguing that they were excessive, the other that they were insufficient.
The defendants complained that the award to Kathleen Keating is excessive in general and particularly because it probably includes an award for an unpleaded claim for pecuniary loss of her husband's services around the house. This contention is made because the plaintiffs' expert economist was permitted to testify, in addition to loss of earnings, to a $57,000 estimate as the value of the loss of the deceased's services.
Responding to the particular argument regarding an award for loss of services, we observe first that it is purely speculative to assume that the jury itemized in its calculations a $57,000 award categorized as a pecuniary loss. The jury was asked for a lump sum award, without itemization. The trial judge did not instruct the jury that there was a category of pecuniary loss known as loss of services. The trial judge correctly charged the jury that compensable damages included loss of love, affection, companionship, and loss of support, service and society. He told them that they could award damages for loss of consortium, and explained what that was. He explained, finally, that they could award for loss of support an amount that was reasonably proved, and told them that loss *927 of support included loss of the capacity to earn in the future. The pleadings in this case asked for all of these elements of damage. We can assume no more than that all of these elements, as instructed, were properly taken into account by the jury in reaching its verdict as to the award. A lump sum judgment of damages is presumed to award all items of damage claimed. Taylor v. Dupree, 484 So.2d 986 (La.App. 3rd Cir.1986), writ. denied, 488 So.2d 201 (La.1986).
Because we do not know whether the jury considered loss of services around the house as a pecuniary loss, or as simply a part of loss of consortium, it is inappropriate that we take this case as a means of expressing our views as to whether or not such an item of damage can properly be categorized as a pecuniary loss. We pretermit that question for the same reason as the second circuit did in Marceleno v. State, Dept. of Highways, 367 So.2d 882 (La.App. 2nd Cir.1978), writ. denied, 369 So.2d 1364 (La.1979), because we find that the total award was within the range of the jury's discretion.
The deceased was a retired educator from local high schools in Calcasieu Parish and McNeese State University. He had been active all his life and remained active after retirement. At the time of his death he was a member of the Calcasieu Parish School Board. He was also engaged in other activities showing financial promise. He had a life expectancy of 13.6 more years. He was given a physical examination two weeks before his death and pronounced in good health. Charles Bettinger, an economist, testified that the loss of support was at least $60,267. On the evidence presented, the jury would have been justified in making an award significantly higher, for loss of support up to the time of trial and loss of support in the future.
The record also contains proof of funeral and other out-of-pocket expenses slightly less than $10,000.
Vernon and Kathleen Keating were married for nearly 40 years. They had raised two children. The Keatings had never had marital difficulties; they were apparently a model of family closeness. The deceased was extraordinarily devoted to home and family, and constantly tended the needs of both. An energetic man and a lover of work, Keating busied himself not only with his school board activities and business pursuits, but also worked around the house, keeping it in physical repair, adding improvements, doing the housework itself, making things, and tending the yard and flowers. The deceased's wife, and their church pastor, both testified to the familial closeness and to the great suffering and loss sustained by the widow.
The award for loss of love and affection to Mrs. Keating, which we speculate is in the vicinity of $300,000, is in the upper range for wrongful death. ($325,000 for loss of love, affection, and companionship, Hellmers v. Dept. of Transportation and Devel., 503 So.2d 174 (La.App. 4th Cir.), writ denied, 505 So.2d 1141 (La.1987); $250,000 awarded for the loss of love, affection, companionship, society and consortium of a husband, Moon v. City of Baton Rouge, 522 So.2d 117 (La.App. 1st Cir. 1987), writ. denied, 523 So.2d 1319, 1320, 1327 (La.1988); writ denied, 533 So.2d 374 (La.1988)two of the highest awards in this state). Our decision that this award is not excessive does not rest, however, on these two cited or any other prior awards, but rather on the individual circumstances of the present case. We find from a study of this record, and based on our analysis above, that the jury did not abuse its discretion, and that the total award to Kathleen Keating was not excessive.
Turning now to the awards of $25,000 each to the major sons, Patrick and Thomas, the defendants urge that the awards are excessive and should be reduced to $20,000 each, while the plaintiffs complain that the awards are insufficient. To the extent that we find these awards rather low, we agree with the plaintiffs. However, an appellate court's duty is not to substitute its judgment for that of the jury, but to determine if an award is so insufficient, or excessive, as to amount to an abuse of discretion. In this case the sons are adults, and independent. On this *928 record we find no abuse of the jury's discretion. The awards will stand.
For the foregoing reasons, the judgment of the trial court is affirmed. Holston's Ambulance Service, Inc., and Safeco Insurance Co., Inc., will pay the costs of this appeal.
AFFIRMED.