776 So.2d 620 (2000)
Randolph (Randy) Wallace HARPER, etc.,
v.
FALRIG OFFSHORE, INC., et al.
No. 00 694-CA.
Court of Appeal of Louisiana, Third Circuit.
December 20, 2000.
Rehearing Denied February 21, 2001.
*623 Steven Broussard, Lake Charles, LA, Counsel for Randolph (Randy) Wallace Harper, Taylor Alexander Harper, Blake Lee Harper, Plaintiff/Appellant/Appellee.
Gary Alan Hemphill, Terriberry, Carroll & Yancey, New Orleans, LA, Counsel for Steamship Mutual Underwriting Associates (Bermuda) Limited, Defendant/Appellee/Appellant.
Edwin Gustav Preis, Jr., Preis, Kraft & Roy, Lafayette, LA, Counsel for Falrig Offshore, Inc., Defendant/Appellee/Appellant.
Richard J. Hymel, Preis, Kraft & Roy, Lafayette, LA, Counsel for Falrig Offshore, Inc., Defendant/Appellee/Appellant.
Court composed of WOODARD, SULLIVAN, and GREMILLION, JJ.
WOODARD, Judge.
Mr. Randy Harper worked on a Falrig Offshore, Inc.'s (Falrig) jack-up rig (Falrig 19) more than three miles off Louisiana's coast. On the morning of November 7, 1996, his supervisor ordered him to install a rain shield over the crew's living quarters entrance. While working from a wooden stepladder approximately 45 inches above the deck, he fell while reaching for a sledge hammer being handed to him from above the first deck level. As a result of his fall, he broke his left heel bone and injured his back and neck. Later, he filed suit against his employer, Falrig, and its insurer, Steamship Mutual Underwriting Association Limited (Steamship), alleging unseaworthiness and negligence under the Jones Act. He also sued the ladder manufacturer, Blue Ribbon Ladder Company (Blue Ribbon)but it reached a minimal settlement before trial. After a bench trial, the trial court assessed 75% of the fault to Mr. Harper and 25% to Falrig. It awarded $75,505.00 for past and future medicals; $250,000.00 for past, present, and future pain and suffering; $20,000.00 for loss of household services, and $606,528.00 for past and future lost wages.
All parties appealed. Mr. Harper devolutively appeals; Falrig and Steamship suspensively appeal. All question the trial court's future wage loss award. Falrig and Mr. Harper appeal the fault findings and its apportionment. Steamship contends that the trial court should have dismissed it from the suit under the Louisiana Direct Action Statute, La.R.S. 22:625. Mr. Harper alleges that the trial court erred in its involuntary dismissal decisions, in finding Falrig 19 to be seaworthy, and in granting its general damages awards.
We affirm the trial court's findings of fault concerning Falrig, its apportionment of fault between the parties, its finding that the vessel was seaworthy, the general damages award, and the involuntary dismissal decisions. However, we reverse the future wage loss award and remand for a new trial on that issue. We also reverse the trial court's decision not to dismiss Steamship from this case and cast Falrig with the appeal costs.

* * * * * *
*624 On November 7, 1996, Falrig employed Mr. Harper as a welder, as a part of the rig's crew. On that day, Falrig operated a jack-up drilling rig, Falrig 19, more than three miles off of southwest Louisiana's coast. When Mr. Harper started work at 6:00 a.m., the rig's supervisor told him to install a metal rain shield over the doorway to the sleeping quarters.
Mr. Harper filled out a Job Safety Analysis form (JSA), describing the job task and how to accomplish it. Mr. Harper read the JSA to his supervisor, Mr. Allen Brewer, and several other rig workers, who were present at the safety meeting. Mr. Brewer did not suggest any changes to the proposed work method. The JSA stated, in part, that the area should be roped off and that there should be a fire watch because of the planned welding. As a storm was approaching, they wanted to get the shield up before it arrived.
In order to construct the rain shield, Mr. Harper had to cut a piece of 3/16 thick metal to a size of six feet long and 48 inches wide. He welded padeyes on the metal so that a crane operator could hook up his slings and lift it into place. After the crane lifted the metal into place, Mr. Harper marked the wall with a straight edge. Then, he used a grinder to buff the paint off the wall in those areas where he planned to tack-weld the shield. To reach the areas on the wall to buff them, Mr. Harper stood on a six-foot wooden stepladder. This part of the operation required him to move the ladder several times. Then, the crane operator lifted the shield from the deck to put it in place for the final installation.
While this final lift took place, Mr. Brewer stood on the upper deck above the doorway to the living quarters and pulled on the slings from the crane, holding the metal shield and assisting Mr. Harper in positioning the shield. Two other rig employees, Mr. Shane Weldon and Mr. Billy Lomax positioned themselves to one side of the shield and attempted to push the shield into position. As they tried to position the shield, it jammed between a vertical pipe and the wall.
At this point, the ladder was positioned just in front of the shield, while Mr. Harper stood with his right foot on the fourth step of the ladder, approximately, 45 inches above the rig's floor and with his left foot on the wooden stepladder's third rung. He chose not to wear a safety belt, which Falrig's safety rules would have required if he were working 48 inches or more above the deck. He asked Mr. Brewer to get a sledgehammer so that he could tap the shield into place before welding it. Mr. Brewer retrieved it, and while standing on the first deck over the shield, he lowered it down onto the shield. Mr. Harper reached out to grab it. Although, he is uncertain if he actually picked it up with both hands or if he was simply in the act of reaching for it, nevertheless, he fell off the ladder, first, striking his left heel with his full body weight, then falling backwards, striking his buttocks and then his head.
Following Mr. Harper's injury, Falrig evacuated him from the rig for medical treatment. After some months of conservative treatment and physical therapy, a doctor referred him to an orthopedic surgeon when x-rays revealed a broken bone in his left heel. On May 14, 1997, Dr. Thomas Clanton, an orthopedic surgeon, operated on his left heel to repair the break. After his surgery, the doctor ordered a soft cast until the swelling went down and then placed him in another soft cast for eight weeks with crutches. Afterwards, Mr. Harper used a walking brace for two months. Once he began walking, he had to use a jobst stocking for the swelling. He continues to have some pain in his left heel. Because of the injury and the surgery, he lost a portion of the up-and-down motion in his ankle and all of the in-and-out movement, as well as developed complex regional pain syndrome, which is a nerve related problem that causes an extraordinary amount of pain. It cannot be cured; however, the level of pain fluctuates. *625 During the day, he must elevate his foot two to three times a day for fifteen to thirty minutes intervals. Otherwise, his foot swells. And, he must wear special orthopedic shoes with special inserts.
Also, the fall resulted in persistent pain in his neck and back. On March 17, 1997, Dr. Kevin Gorin, board certified in pain medicine, examined him and found that he suffered from left lower extremity complex regional pain syndrome, chronic cervical and lumbar myofascial pain syndrome, and depression. In order to manage his pain for the remainder of his life, he will need injections and medications for spasms, pain, depression, and sleeping.
On September 11, 1997, Dr. Jeffery J. Kozak, an orthopedic specialist with a subspeciality in spinal reconstructive surgery, examined him. He found that Mr. Harper's cervical and lumbar pain were due to an aggravation of degenerative changes of the cervical and lumbar spine. He opined that the accident caused this process to become painful and that pain management should be his primary care, as surgery was not warranted at this time. He believed that Mr. Harper has activity limitations of no repetitive bending and twisting and that he has reached maximum medical improvement level.
Mr. Harper filed suit against Falrig and its insurer, Steamship, alleging unseaworthiness and negligence under the Jones Act. The parties stipulated to the Jones Act's application in this case. He also sued Blue Ribbon, the ladder manufacturer; however, he dismissed it before trial after a nominal settlement.
On April 13, 1999, this matter proceeded to a bench trial. In a written opinion, the trial court assessed 75% of the fault to Mr. Harper and 25% to Falrig; awarded $75,505.00 for past and future medicals; $250,000.00 for past, present, and future pain and suffering; $20,000.00 for loss of household services; and $606,528.00 for past and future lost wages. Mr. Harper devolutively appeals, and, Falrig and Steamship suspensively appeal the trial court's decisions.
All parties appeal, alleging various assignments of error. Citing different reasons, they all appeal the trial court's award of future wage loss damages. Falrig and Mr. Harper appeal its findings and apportionment of fault. Steamship alleges that the trial court erred in denying its exception of no right of action and holding it amenable to suit under the Louisiana Direct Action Statute. Mr. Harper alleges that the trial court erred by partially granting Falrig's motion for involuntary dismissal of some of his contentions, in finding Falrig 19 to be seaworthy, in granting the general damage award, and in failing to include alleged losses for permanent disability, mental anguish, and loss of enjoyment of life. We discuss all of these contentions below.

* * * * * *

THE FINDINGS OF FAULT
Falrig contends that the trial court erred in finding that its supervisor's act of handing the sledgehammer to Mr. Harper helped to cause the fall and is clearly wrong. Mr. Harper contends that the trial court's apportionment of fault should be changed to increase Falrig's fault percentage.
The Jones Act permits an injured seaman to bring a negligence suit against his employer. 46 U.S.C.App. § 688(a) states:
Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United *626 States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.
In Foster v. Destin Trading Corp.,[1] the Louisiana Supreme court said, concerning the Jones Act:
The employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery. See id. [Referring to 46 U.S.C.App. Sec.688]. Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a safe place to work, the existence of a dangerous condition on or about the vessel, or any other breach of the duty of care. See Davis v. Hill Engineering, Inc., 549 F.2d 314 (5th Cir.1977); 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, sec. 6-21, at 312 (2d ed.1994). The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely the duty to take reasonable care under the circumstances. Gautreaux v. Scurlock Marine, Inc. 107 F.3d 331, 335-36 (5th Cir.1997). The seaman bears the evidentiary burden of proving that a breach of the duty owed by the employer was a cause of his injuries. However, a seaman need only present "slight evidence" that his employer's negligence caused his injuries in order to reach the jury or to be sustained upon appellate review Id. at 334-35. The employer can introduce evidence of the seaman's own negligence to reduce damages through application of pure comparative fault principles. Like his employer, the seaman must meet the standard of ordinary prudence by acting as a reasonable seaman would act under the same circumstances. Id. at 339.
In reviewing Jones Act claims in Louisiana state courts, the Louisiana review standard, rather than federal law, is the rule of decision.[2] In Jim Walter Homes, Inc. v. Jessen,[3] we stated that:
Our Supreme Court has recently reiterated the standard of review on appeal in Syrie v. Schilhab, 96-1027, p. 4 (La.5/20/97); 693 So.2d 1173, 1176 (citations omitted) as follows:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong". This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.
The trial court states, in part, in its written reasons for judgment:
This Court finds that based on the totality of the circumstances and an application of common-sense, reaching for and obtaining the sledge hammer while *627 on the ladder was the cause-in-fact of this accident. Having someone hold the ladder was not required. It was an option that the Plaintiff could have exercised and a service which would have been provided had he asked.
The Plaintiff requested the sledge hammer to use while on the ladder. His request was acceded to by Brewer. According to the Plaintiff's version, Brewer laid the hammer on the rainshield and he had to reach for it.
According to the Defendant's version, the hammer was handed directly to the Plaintiff from Brewer, who was above the Plaintiff on an elevated level.
It is unnecessary for this Court to decide which of these versions is more credible than the other because acceptance of either leads to the same result.
In the Plaintiffs version, the Plaintiff requested the sledge hammer. It was put in an unnecessarily unsafe position by Brewer. Brewer is a supervisor in charge of safety. This Court in no way believed that he, therefore Falrig, is responsible for every safety violation on board. However, by his own testimony, he is responsible to correct those he sees, or any procedure which appears unsafe. It is axiomatic that he, therefore Falrig, is responsible for unsafe procedures in which he participates. Common sense and safe practice recognized by ordinarily prudent individuals would have dictated that Brewer walk down the readily accessible stairs to hand the Plaintiff the hammer. Instead, his own poor judgment invited the Plaintiff's poor judgment. Although each hand is responsible for his own safety, Brewer was the supervisor and was responsible for all unsafe conditions or procedures occurring in his presence. That was Brewer's fault.
Under the Plaintiff's own scenario, he exercised poor judgment in neither requesting that Brewer or someone else hand him the sledge hammer from a safe vantage nor simply moving the ladder to effectuate safe access. That was the Plaintiff's fault. These actions created an unsafe situation which was the cause-in-fact of this accident.
An analysis of the Defendant's scenario yields exactly the same result. Brewer handed the Plaintiff a 10-pound sledge hammer from above, rather than taking the stairs or requesting someone else deliver it. His own poor judgment in doing so invited the Plaintiff's poor judgment. That was Brewer's fault.
The Defendant contends that because the Plaintiff does not state he lost his balance proves that he did not. Even if a ladder "kicks out," the individual on the ladder would be thrown off balance. The fact that the Plaintiff does not recall or relate this momentary sensation (which was immediately followed by an extremely traumatic event) does little to convince this Court that, in light of the totality of the circumstances and application of common sense, it did not happen.
Furthermore, as stated previously, these conclusions are based on a totality of the circumstances and the application of common sense. Work on ladders is an every day occurrence performed by ordinary people. Every day, ordinary people do foolish things on ladders evidencing poor judgment. Some ordinary people exercise good judgment and behave safely on ladders. Regardless, poor judgment attributes fault to those who exercise it. These men were particularly experienced in this kind of work and procedure and should certainly be held to no lesser standard than ordinary people. Expert testimony is neither required nor helpful in reaching the conclusions contained herein.
The cause of the accident was a result of an isolated incident of operational negligence, not unseaworthiness. The Plaintiff's negligence contributed to this accident in the amount of 75 percent. The actions of Falrig, through Brewer, *628 contributed to this accident in the amount of 25 percent.
We have carefully reviewed the record along with the parties' arguments and find the trial court's factual findings to be reasonable. Therefore, they are not manifestly erroneous or clearly wrong.

APPORTIONMENT OF FAULT
Regarding fault, Mr. Harper contends that Falrig's percentage should be increased; Falrig urges that it should be absolved from fault. "In a Jones Act case, the court should determine the negligence of the employer according to the standard of a reasonable employer under like circumstances, and ... the contributory negligence of the seaman according to the standard of a reasonable seaman under like circumstances."[4]
The trial court found Mr. Brewer's isolated act of handing Mr. Harper a sledgehammer from above to have been at fault and assessed him with 25% of the fault. It attributed 75% of the fault to Mr. Harper because of his "poor judgment." We think that the fact that Mr. Harper chose to stand precariously balanced near the top of the ladder, without a safety belt, which he could have used since he was nearly 48 inches above the ground, attempting to or handling a sledgehammer bordered on being unreasonable, especially since he was a very experienced welder and worker. He simply exercised bad judgment, which mainly caused him to fall. The trial court's apportionment of fault is not manifestly erroneous or clearly wrong.

SEAWORTHINESS
The trial court found the rig to be seaworthy. Mr. Harper contends that this finding is erroneous. Further, the trial court found that Mr. Brewer's act of handing the sledgehammer to Mr. Harper, while he was on the ladder, helped to cause him to fall. This is because, either, as he had to reach for it or had it in his hand, which under these circumstances, was a negligent act. It held that Mr. Brewer should have walked down to the same deck as Mr. Harper and then handed the sledgehammer to him.
As the owner of the vessel, Falrig owed a seaworthiness obligation under the general maritime law, which is completely independent of the duty owed its employees under the Jones Act.[5] Liability is imposed for unseaworthiness regardless of fault, negligence, or the failure to exercise due care on the part of the vessel owner.[6] In determining whether a vessel is seaworthy or not, all that is necessary is that there be some defective condition of the vessel that caused the injury.[7] A vessel's crew's unsafe work methods can constitute unseaworthiness.[8] However, an isolated act of operational negligence will not be enough to create an unseaworthy condition. The acts must be "pervasive" for them to rise to the level of unseaworthiness.[9]
In the instant case, the trial court found that handing the sledgehammer to Mr. Harper was an unsafe act, given that he was standing near the ladder's top and was nearly 48 inches off the ground. We agree that, under the circumstances, this was an unsafe work method and, therefore, partly helped to cause Mr. Harper to fall, but it was an isolated act not a pervasive condition. Thus, the evidence is insufficient to establish that Falrig 19 was unseaworthy. *629 Accordingly, we affirm the trial court's decision, finding that Falrig 19 was seaworthy.

MOTION FOR INVOLUNTARY DISMISSAL
At the close of Mr. Harper's case, Falrig moved for an involuntary dismissal of all of his claims. The trial court granted Falrig's motion regarding his claims that he was being rushed, that he was not instructed to wear a safety belt, and that the ladder was defective. The trial court reserved ruling on whether the ladder, although not defective, had non-skid feet and whether it was secured to the deck.
La.Code Civ.P. art. 1672(B) states:
In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.
When determining the merits of a motion for involuntary dismissal, the trial court is not required to review evidence in the light most favorable to the plaintiff; it is only required to weigh and evaluate all of the evidence presented up to that point and grant dismissal if the plaintiff has failed to establish his claim by a preponderance of evidence.[10] An involuntary dismissal may not be reversed absent manifest error.[11]

1. JOB RUSH
Mr. Harper testified that he had the distinct impression that he had to get the rain shield up before the rain arrived. In his brief, he argues that "being rushed" was a real factor in his mind as he worked. He contends that it was one of the factors that should have been considered in allocating fault. He argues that the trial court erred in granting an involuntary dismissal of this contention. However, Mr. Harper did testify that as he worked, he did not work at an unsafe speed. Thus, there is insufficient evidence to establish by a preponderance of the evidence that the pressure to rush his performance caused the accident. There is no manifest error in this part of the trial court's ruling.

2. THE SAFETY BELT
Mr. Harper contends that the trial court erred in dismissing his contention that Falrig's failure to instruct him to wear a safety belt caused the accident. The evidence established that Falrig's safety policies required workers to wear a full body harness when working 48 inches above the deck and outside protective handrails. However, he was working on the fourth step, which was approximately 44 to 45 inches above the deck. He testified that, as long as he remained below the ladder's fifth step, he was not required to wear a safety belt. We agree with the trial court that this does not absolve him of his obligation to be responsible for his own unsafe actions and find that there is no manifest error in the trial court's ruling.

3. LADDER DEFECTIVE
Mr. Harper contends that the trial court erred in holding that the ladder introduced into evidence was not defective and was not a different ladder. He argues that the accident report indicates that something failed on the ladder, but the ladder produced at trial did not show any evidence of such failure.
Following the accident, Mr. Allen Brewer photographed and tagged the ladder in question. At trial, he compared the photographs *630 with the ladder introduced into evidence and testified that he was certain that the ladder in evidence was the same one. He specifically identified some paint markings on the ladder that he recognized when he first saw the ladder and his handwriting on a tag which was placed on it immediately following the accident.
Mr. Harper argues that the accident ladder was "new" and that the ladder produced at trial was dirtier than the one depicted in the photographs. However, Mr. Brewer testified that the ladder may have been used on the rig after the accident and it would quickly show additional wear. As there were two evidentiary views on this issue and the trial court's decision is reasonable, it did not err in holding that the ladder in evidence was the same and that it was not defective.

GENERAL DAMAGES
Mr. Harper alleges that the trial court's award of $250,000.00 in general damages is erroneously low. In Louisiana Farms v. La. Dept. of Wildlife & Fisheries,[12] we said:
The trial court is afforded much discretion in granting damage awards, and this extends to special damages. Sinor v. National Casualty Company, 633 So.2d 720 (La.App. 1 Cir.1993). The trial court has great discretion in assessing damages, and the trial court's finding in this regard will not be disturbed on appeal in the absence of clear abuse of discretion. La.Civ.Code art. 2324.1; 1900 Partnership v. Bubber, Inc., 27,475 (La.App. 2 Cir. 11/1/95); 662 So.2d 808, writ denied 96-0037 (La.2/28/96); 668 So.2d 369. In other words, an appellate court cannot modify a trial court's award of damages unless it is not supported by the record. Charles v. Arceneaux Ford, Inc., 542 So.2d 846 (La.App. 3 Cir. 1989).[13]
The question we must determine is whether "the award for particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact."[14]
When Mr. Harper fell, he landed on his left heel and fell backwards onto his buttocks and head; he did not lose consciousness. After Falrig removed him from the rig, he went to an emergency room, where a doctor treated him. That doctor sent him home and directed him to keep his foot elevated for two months. When this did not help his condition, he went to another doctor, who prescribed physical therapy. He continued to have back and neck pain during this time, which began at the time of the accident. He did not have radiating pain from his neck but had a numbing sensation in the tips of all of his fingers and thumbs, which was later determined to be the result of smoking. His low back pain was located in his midlumbar region and was without radiation.
Dr. Kevin Gorin, a board certified specialist in physical medicine, initially evaluated Mr. Harper for cervical and lumbar strain on March 17, 1997, following a referral from Dr. William Foster, a neurosurgeon. Thereafter, Dr. Gorin saw him approximately once every five months.
He diagnosed Mr. Harper as suffering from left lower extremity complex regional pain syndrome, which resulted from the trauma to his left leg, and opined that this condition was stable. He also diagnosed him to be suffering from chronic cervical and lumbar myofascial pain syndrome, and depression caused by the chronic pain. He treated these conditions conservatively *631 with muscle relaxants, anti-inflammatories, antidepressants, and selective injection therapy in his back for pain control. Dr. Gorin believed that he will need medication for the chronic pain for the foreseeable future and injections to his back on an "as needed" basis. He was not able to predict the frequency.
Dr. Thomas O. Clanton, a board certified orthopedic surgeon, examined Mr. Harper's left heel on May 1, 1997. Dr. Ford had referred Mr. Harper for a badly broken heel bone. Dr. Clanton reviewed his C.T. scan and determined that he had a loss of muscle in his left calf. His x-rays revealed a broken heel bone with multiple breaks. He determined that Mr. Harper had arthritis in the joint.
On May 14, 1997, Dr. Clanton operated on Mr. Harper's heel. He did a subtalor joint fusion and inserted a bone screw to hold the bones together. Mr. Harper wore a cast for eight weeks and used crutches. Then, the doctor placed him in a walking brace for two months and, afterwards, supportive shoes. Because of the surgery, Mr. Harper had post operative swelling in his ankle which required him to wear elastic stockings. He has a slight movement loss in up-and-down motion, and the fusion eliminated all of the ankle's in-and-out movement. And, he continues to experience pain.
His restrictions are to avoid using ladders, walking on uneven surfaces, and impacting his left heel. His future medical care requirements are to wear custom shoes.
Dr. Jeffrey J. Kozak, an orthopedic specialist, with a sub-speciality in spinal reconstructive surgery, saw Mr. Harper on September 11, 1997, for neck and low back pain. At this first appointment, Mr. Harper brought his medical records with him. They consisted of a left lower extremity EMG, a bone scan, a follow-up EMG, x-rays, a cervical MRI scan, a cervical C.T. scan, a lumbar plain x-ray, a lumbar MRI scan, and a lumbar CT scan. Dr. Kozak reviewed them and ordered a repeat EMG/ NCV of the upper extremities, the STEP program (Spinal Treatment Evaluation Process), and a functional capacity examination. He found that Mr. Harper's cervical and lumbar pain were due to an aggravation of his cervical and lumbar spine degenerative changes. He reported that these degenerative changes, most likely, pre-existed the accident and that the November 7, 1996 accident, caused the pain process. He also stated that Mr. Harper was not a candidate for surgery at this time and believed that his condition was permanent and that pain management should be his primary care.
In the functional capacity examination, Mr. Harper demonstrated an ability to lift 26 pounds, carry 50 pounds, and push and pull 50 pounds. This simply demonstrated his ability to function in spite of pain limitations. He has generalized activity restrictions of no repetitive bending and twisting, and he has reached his maximum medical improvement level.
Considering the nature of these two injuries and the changes in lifestyle, which was forced upon him, we cannot conclude that the trial court abused its vast discretion in awarding him $250,000.00 in general damages. This assignment of error is without merit.

PERMANENT DISABILITY
In this assignment Mr. Harper contends that the trial court erred in failing to make a separate award for his permanent disability in addition to its total award of $250,000.00 in general damages.
While we have upheld separate awards of permanent disability and general damages,[15] well-settled law does not require a trial court to itemize a general damage award.[16] The trial court's failure to itemize permanent disability in the general *632 damage award does not constitute an abuse of discretion or require modification of the award.[17] It is obvious from the trial court's reasons for judgment that, in making the general damage award, it was aware of Mr. Harper's disability arising from the accident. It stated:
The Plaintiff sustained a fractured heel and neck and back injury. After seven months of conservative treatment, the Plaintiff had surgery on his heel. Because of a pin inserted in his heel, he has no lateral movement in his foot. He continues to have pain in his heel, lower back, and neck. He continues to have balance problems and sleep problems.
As a result of his injuries, the Plaintiff can no longer perform some general household tasks. He is no longer able to engage in many of the recreational activities he once enjoyed. He is disabled from his job as an offshore welder.
Furthermore, the trial court made an award for future lost wages, which requires an element of proof that Mr. Harper is disabled from the employment that he was capable of performing before his injury. It is obvious that the trial court considered his disability in making the general damage award, and this total award is entirely appropriate. This assignment of error is without merit.

MENTAL ANGUISH
Mr. Harper alleges that the trial court failed to make an award for mental anguish and suffering; however, nowhere in his brief is this contention separately briefed. In accordance with our rules, we will treat this assignment of error as abandoned.[18]

LOSS OF ENJOYMENT OF LIFE
Mr. Harper contends that the trial court erred in failing to separately award anything for his alleged loss of enjoyment of life in addition to the award of $250,000.00 in general damages. However, again we note that the trial court included this in its general damages award.
Relying on Knepper v. Robin,[19] Mr. Harper argues that loss of enjoyment of life damages should have been awarded as separate damages. In Knepper, we held that in a jury trial, a trial court erred in refusing to list loss of enjoyment of life as a category of damages on the jury's special verdict form.[20] Because of the absence of that category on the jury form, the jury did not have an opportunity to make an award for that type of damage. However in this bench trial, the trial court chose to include loss of enjoyment of life damages within the general damages award and designated the loss of enjoyment of life award there in the Reasons for Judgment and in the judgment. Accordingly, the trial court did not abuse its vast discretion[21] in making damage awards by failing to separately categorize each damage award. This assignment of error is without merit.

FUTURE WAGE LOSS
All parties contend that the trial court erred in calculating Mr. Harper's future wage losses; however, Mr. Harper alleges that the trial court should not have reduced the award from $597,684.00 to $525,000.00 based upon its finding that he had shown no desire to seek employment with a more remunerative compensation and better benefits than working at his sister's tuxedo shop for $7.00 per hour. Falrig and Steamship maintain that the trial court erred in its award of future wage losses to Mr. Harper, because his economist based his calculations on an April 1998 wage base, rather than on the accident date, November 7, 1996, and he *633 assumed an annual wage increase of 2% for the remainder of Mr. Harper's work life.
Because of our decision below concerning this issue, we need only address Mr. Harper's expert's use of a projected wage for Mr. Harper in April of 1998, which included two pay increases, rather than using the date of the accident. The law for calculating future wage losses in maritime cases is found in Culver v. Slater Boat Co.,[22] also known as Culver II. It clearly provides that the calculation of the present value of future lost wages "begins with the gross earnings of the injured party at the time of the injury."[23] At trial, Mr. Harper's economist based his estimates on a wage base higher than his actual gross wages at the time of the injury. The trial court then reduced his estimate of $597,687.00 by an amount it felt appropriate because Mr. Harper had chosen not to seek higher paying employment. The base from which the trial court made its reduction was not calculated in compliance with Culver II. Thus, because its award is infected with legal error, we reverse it.
Falrig and Steamship argue that, as Mr. Harper's economist's calculations were wrong, we should adopt its expert's calculations of future wage loss. We decline to do this, as its expert failed to comply with our decision in Parks v. Pine Bluff Sand & Gravel Co.[24] by including Falrig's employer FICA contributions in calculating its estimate of Mr. Harper's future loss wages.
As both economists' opinions contain errors, we must reverse this portion of the case and remand to the trial court for a new trial on the issue of the quantum of Mr. Harper's future wage loss, which is to be administered in strict compliance with Culver II and Parks.

THE LOUISIANA DIRECT ACTION STATUTE
On January 6, 1999, the trial court denied Steamship's peremptory exception of no right of action and, after the trial, did not dismiss Mr. Harper's direct action claims against it. Steamship contends that this was error.
The direct action statute, La.R.S. 22:655(B)(2), states:
This right of direct action shall exist whether or not the policy of insurance sued upon was written or delivered in the state of Louisiana and whether or not such policy contains a provision forbidding such direct action, provided the accident or injury occurred within the state of Louisiana. Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if such provisions are not in violation of the laws of this state.
(Emphasis added.)
At trial, the parties stipulated that the accident happened outside Louisiana's territorial waters. The trial court recognized that the "accident" had not occurred in Louisiana but, nevertheless, held that the words "or injury" triggered the application of the statute when Mr. Harper returned to his home in Louisiana after the offshore accident and experienced medical consequences in Louisiana from his out-of-state accident. The trial court erred.
Statutes are to be applied as written when the result will not lead to any absurd consequences.[25] The plain reading of the statute establishes that the words "or injury" are meant to be the injury arising out of the "accident" that "occurred within the State of Louisiana."[26] In this *634 case, the "injury" did not occur in Louisiana. It occurred in the international sea beyond the three mile limit of Louisiana's territorial sea.
The logical problem of the trial court's holding is that it, effectively, means that anyone injured anywhere, whether a Louisiana citizen or not, could assert a direct action against an insurer in Louisiana provided s/he was, subsequently, present in Louisiana at any time before completely recovering from the injuries. Applying the trial court's reasoning, this is true because the "injury" continues to occur so long as the injured person continues to allege that s/he suffers from ongoing problems because of an accident occurring outside the state. This is a strained construction of the direct action statute's plain language.[27] Thus, we reverse this part of the trial court's decision.

CONCLUSION
We affirm the trial court's fault finding concerning Falrig, its fault apportionment between the parties, its decision on the involuntary dismissal motion, its finding that Falrig 19 was seaworthy and the award of general damages. We reverse the future wage loss award and remand for a new trial on this issue. Also, we reverse its decision not to dismiss Steamship from the case and, hereby, order its dismissal. We cast Falrig with the costs of the appeal.
AFFIRMED IN PART; REVERSED IN PART; REMANDED IN PART; AND RENDERED.
NOTES
[1] 96-0803, p. 3-4 (La.5/30/97); 700 So.2d 199, 208.
[2] See Milstead v. Diamond M. Offshore, Inc. 95-2446 (La.7/2/96); 676 So.2d 89.
[3] 98-1685, pp. 4-5 (La.App. 3 Cir. 3/31/99); 732 So.2d 699, 702.
[4] Vendetto v. Sonat Offshore Drilling Co., 97-3103, p. 9 (La.1/20/99); 725 So.2d 474, 479.
[5] Brister v. A.W.I., Inc., 946 F.2d 350 (5th Cir.1991); Miles v. Melrose, 882 F.2d 976 (5th Cir.1989), aff'd, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990); Johnson v. Offshore Express, Inc. 845 F.2d 1347 (5th Cir.1988), cert. denied, 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 533 (1988).
[6] Brister, 946 F.2d 350; Miles, 882 F.2d 976; Johnson, 845 F.2d 1347.
[7] Phillips v. Western Co. of N. Am., 953 F.2d 923 (5th Cir.1992).
[8] Id.
[9] Vendetto, 725 So.2d 474.
[10] Mayes v. State, 96-789 (La.App. 3 Cir. 12/11/96); 685 So.2d 497, writ denied, 97-0113 (La.3/7/97); 689 So.2d 1376.
[11] Id.
[12] 95-845, pp. 31-32 (La.App. 3 Cir. 10/9/96); 685 So.2d 1086, 1103, writs denied, 97-0486 (La.4/4/97); 692 So.2d 420; 97-0507 (La.4/4/97); 692 So.2d 422. See also Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La. 1993).
[13] See also, Hollenbeck v. Oceaneering Int'l, Inc., 96-0377 (La.App. 1 Cir. 11/8/96); 685 So.2d 163, writ denied, 97-0493 (La.4/4/97); 692 So.2d 421.
[14] Hollenbeck, 685 So.2d at 172.
[15] Lougon v. Era Aviation, Inc., 609 So.2d 330 (La.App. 3 Cir.1992).
[16] Keating v. Holston's Ambulance Serv., Inc., 546 So.2d 919 (La.App. 3 Cir.1989).
[17] Eskine v. Regional Transit Auth., 531 So.2d 1159 (La.App. 4 Cir.1988).
[18] UNIFORM RULES COURTS OF APPEAL, RULE 2-12.4.
[19] 99-95 (La.App. 3 Cir. 11/17/99); 745 So.2d 1248, writ denied, XXXX-XXXX (La.2/18/00); 754 So.2d 955.
[20] Id.
[21] Youn, 623 So.2d 1257.
[22] 722 F.2d 114 (5th Cir.1983) (en banc), cert. denied, 467 U.S. 1252, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984).
[23] Id. at 117.
[24] 97-682 (La.App. 3 Cir. 2/18/98); 712 So.2d 905.
[25] La.Civ.Code art. 9.
[26] Cambre v. St. Paul Fire & Marine Ins. Co., 331 So.2d 585 (La.App. 1 Cir.), writ denied, 334 So.2d 434 (La.1976); see generally, Sprow v. Hartford Ins. Co., 594 F.2d 412 (5th Cir. 1979).
[27] See generally, Miller v. Griffin-Alexander Drilling Co., 715 F.Supp. 164 (W.D.La.1989).